MARY SCHWARTZ *vs*. GERMANIA LIFE INSURANCE COMPANY.

Jan. 11, 1875.

Life Insurance—Duty of Agent as to Delivery of Policy in case of Dangerous Illness of Person whose life is Insured.—When an application for life insurance, received by an agent, is sent by him to the home office of his company, and the company accepts it, and sends a policy to the agent for delivery to the applicant, it is the duty of the agent, unless it is otherwise agreed between the parties, or he is otherwise instructed by the company, to deliver the policy, upon tender of the premium, even although the person whose life is insured may have become dangerously ill. *Schwartz* v. *Germania Life Ins. Co.*, 18 Minn. 448, followed.

Verdict Upheld, though Rendered against Uncontradicted Evidence.—Upon consideration of certain evidence adduced by the defendant upon a material issue, *Held*, that the jury were justified in finding a verdict for the plaintiff, although such evidence was not contradicted or controlled by counter-evidence.

Evidence—Objection that Signature to a Written Instrument is not Proved.—When a written instrument, which, if genuine, would be competent, is offered in evidence, a party wishing to rely on the objection that the signature thereto is not proved, should make that objection specifically at the time of the offer.

Instruction properly Refused.—An instruction which assumes the existence of a fact in issue, *Held*, to have been properly refused.

Action on a policy of insurance in favor of plaintiff, upon the life of her husband, Fridolin Schwartz. The decision upon a former appeal is reported, 18 Minn. 448, a new trial being granted. At the second trial in the court of common pleas for Ramsey county, before *Hall*, J., it appeared that on September 1, 1870, the plaintiff made application to defendant's agent at St. Paul, one Ferdinand Willius, for insurance to the amount of $1,000 upon her husband's life. In answer to the questions contained in the printed form of application, the plaintiff stated therein that her husband's present state of health was good; that he was afflicted with no bodily disease; that his health had up to that time been good; that he had never been afflicted with any serious illness, defect or personal injury; and that she was " aware that this contract of insurance becomes valid only by the payment of the first premium." The application provided that the statements contained in it should form the basis of

the contract, and that the policy applied for "shall not be binding on the company until the amount of the first premium, as stated herein, shall be received by the company, or by some authorized agent thereof, during the lifetime of the party therein insured;" but it contained no agreement or warranty on the part of the applicant that her husband should continue in good health, nor any condition by which the validity of the contract was made to depend on the state of his health at any time subsequent to the application. The agent sent the application to the principal office of the company in New York, and received in return a policy bearing date September 5, 1870, which plaintiff declined to accept; and it was then agreed between her and the agent that the policy should be changed so as to provide for payment of premiums semi-annually, instead of annually. On October 13, the agent returned the policy to the company, that the change might be made. On October 18, a new policy, bearing date September 5, purporting to be issued on the application of September 1, and to be signed by the president and secretary of the company, was sent by mail from the New York office to the agent in St. Paul. This policy provided for a semi-annual payment of premium, as desired by plaintiff, and contained a condition that it should be void, "1. If the declaration made by or for the said assured (the same bearing date September 1, 1870, forming part of this contract, and upon the faith of which this contract is made,) shall be found in any respect untrue."

On October 13, Fridolin Schwartz was attacked by a dangerous disease of which he died on October 29. On October 25, the second policy having been received by the agent, plaintiff went to his office, and was informed by him that it had come. She then asked for the policy, and tendered the amount of the first premium; but the agent refused to receive the premium, or deliver the policy, on the ground that her husband was sick. The second policy was never delivered to plaintiff, but was soon afterwards returned to the New York office, at defendant's request. The necessary proofs of Fridolin

Schwartz's death, and of plaintiff's claim under the policy, were made and served upon defendant.

The agent, Ferdinand Willius, and his brother testified as to instructions from the company in regard to the delivery of policies when the person whose life was insured was not in good health at the time the delivery was asked. The jury found for the plaintiff; a new trial was refused, and the defendant appealed.

*Morris Lamprey*, for appellant.

*H. J. Horn*, for respondent.

YOUNG, J.   Upon the former appeal in this action, (18 Minn. 448,) it was determined that by the execution of the second policy, and its transmission from the home office at New York to the company's agent at St. Paul, the company, defendant, signified its acceptance of the plaintiff's application for insurance upon the life of her husband, Fridolin Schwartz.   If upon the receipt of the policy, and down to the time when the plaintiff tendered the premium and demanded the policy, the agent had no other authority or duty in the matter than simply to deliver the policy on payment of the first premium, then the defendant's acceptance was conditional upon such payment alone.   The tender by the plaintiff on October 25, being legally equivalent to a payment, was a performance of this condition; and thereby a contract of insurance, according to the terms of the policy, was effected between the parties, notwithstanding the refusal of the agent to deliver the policy.   But if, by general or special instructions from the company, the agent was not authorized to receive the premium, or deliver the policy, unless the person insured was in good health at the time, then the acceptance signified by the transmission of the policy to the agent, was conditioned upon the state of health of the person insured at the time for delivery of the policy. And as Fridolin Schwartz was dangerously ill, and near his end, at the time the plaintiff tendered the premium and demanded the policy, the agent was justified in his refusal to deliver the one or receive the other, for the condition of the

defendant's acceptance was not complied with. In that case no contract was ever concluded between the parties, and the plaintiff has no cause of action against the defendant.

At the second trial, the company attempted to prove the existence of such instructions, by the parol testimony of Ferdinand Willius, its agent, and of Gustav Willius, his brother. No counter-evidence of any kind was offered by the plaintiff on this point, but the jury found a verdict in her favor. The principal question on this appeal is whether the verdict can be sustained, in the face of the evidence for the defendant. Ferdinand Willius, after stating that he had been the company's agent, with restricted authority, for ten years, testified on this point as follows : "I did (have instructions) to deliver the policy, only upon payment of the premium, and provided the parties were in good health at the time ; if not in good health, a new examination by a physician must be made ; I am positive I had these instructions from the company ; I have always acted under them during all my agency. Gustav is my brother. In 1870, we were in business together, and are still. He knew of my instructions from the company, and I suppose he acted under them." On cross-examination, he said, "The instructions, I suppose, were in print : they may have been verbal : they may have been in writing. We have had six different sets of instructions of that kind in print. I have been hunting for printed instructions, but cannot find them ; must have been verbal. Have had printed instructions so long as I have had the agency. These printed instructions have been changed by other printed instructions, perhaps half a dozen times during the agency ; couldn't say for certain how many times ; couldn't tell when they were last changed ; believe I received some new instructions and blanks about four weeks ago ; could not tell when the next one before was made ; some of printed instructions related to the manner and circumstances under which the policies were to be delivered. I have searched among the papers for these printed instructions—searched this morning, and about a week ago.

Think I could find two of the previous instructions which were sent prior to the last. The old instructions were generally destroyed when the new ones were received. I don't find the instructions which relate principally to this case. I suppose the instructions under which I acted in refusing to deliver this policy were printed; but printed instructions are sometimes explained and defined in writing or verbally. I have not the printed instructions under which I acted in refusing to deliver the policy in question. I have looked for them without being able to find them." On his re-direct examination, he said, "I made search for those printed instructions in my office, where they ought to be; I searched this morning, and about a week ago, among my papers, where these instructions ought to be; I searched thoroughly. I wouldn't say for certain whether I had these instructions verbally or in print; my impression was they were in print. Don't recollect whether the instructions in this case were accompanied by any written communication; there were no special instructions accompanying the second policy, except such as were found in the letter accompanying it; there were none accompanying the first policy, except what were contained in the letter."

Gustav Willius testified as follows: "I told her (the plaintiff) I could not deliver the policy to her; that in the meantime I had received information of the sickness of Mr. Schwartz, and that I had no right to deliver the policy. I think I stated to her that our instructions were not to deliver the policies in such cases where the parties had been taken sick. (I knew of such instructions from the company.)" On cross-examination, he said: "I cannot say positively as to those very instructions, we had so many different ones, in writing, printed and verbal. I was not the agent of the company. These instructions were directed to my brother;" and thereupon the last sentence in his testimony on the direct examination was stricken out, on the plaintiff's motion. The direct examination being resumed, he said: "I knew of printed instructions to the agent, Ferdinand

Willius, as to this business. I have made search for them at our office, at the time of the first trial, and a few days ago. I couldn't find them. Some of the printed circulars have been destroyed when new ones came. I think I can state the contents of these printed instructions as to the delivery of policies. I don't recollect any verbal instructions given to Ferdinand Willius, my brother. I recollect printed instructions given to F. Willius, in reference to the delivery of policies to persons not in good health. I can't tell where those printed instructions now are; so far as I know, they should be in the place where Ferdinand Willius keeps the papers of that company. We had general printed instructions relating to all policies at the time of this transaction, and prior thereto, in regard to the delivery of policies. I think I can remember their contents. I don't know where they are now. I have looked for them and can't find them. I know and can state the substance of their contents, but not the very words." On re-cross examination: "Those printed instructions were in pamphlet form; think they were not circulars; they were headed, 'General Instructions to Agents.' My brother has received printed, written and verbal instructions during his agency. I may have been present when verbal instructions were given; they may have been in force at this time; I don't remember their contents. I do remember that there were certain general printed instructions in regard to the delivery of policies in general. We had printed instructions; he had also general verbal instructions. I can't tell whether he acted under the printed instructions, or partly under the printed and partly under the verbal, in reference to these policies." On re-direct examination: "The contents of the general printed instructions were that the agent should not deliver policies unless the party (applicant) was in good health, unless he should be re-examined by a physician." On further cross-examination: "I don't recollect the exact language. I give the substance as I recollect it. I think it contained instructions to physicians and agents, eight to ten pages of printed matter.

Think the instructions as to delivery of policies took about one half-page. I can't identify the appearance of these particular instructions. There were some printed instructions in form of circulars and pamphlets. Circulars were partly filed away, and partly destroyed; the circulars have not all been destroyed; probably some there yet. It would take several days to find them among ten years' correspondence. The books did not come regularly. Think the new ones always contained some additions to the old ones; may be some changes; perhaps received new ones four or five times during the agency; don't remember when received the last book; can't say how long ago; guess it was over a year ago."

It is contended that the jury were not at liberty to disregard this testimony, but were bound to find the existence of the instructions alleged; and we are referred to cases holding that " when a fact is sworn to by a witness of fair fame, and who is uncontradicted by other testimony, or any circumstances in which he may stand, the jury are not at liberty to disregard his testimony." *Harding* v. *Brooks*, 5 Pick. 244; *Newton* v. *Pope*, 1 Cowen, 109. This is undoubtedly true, as a rule, admitting however of many qualifications growing out of the nature or subject-matter of the testimony. Thus, in *Harding* v. *Brooks*, the court say that " if it relates to declarations or conversations happening some time before the witness is called to testify, and the precise words are important to the point in issue, and the witness, though confident, is not positive in his testimony, the jury are at liberty to refuse such entire credit as may be necessary to satisfy them that the words in question are fully proved." And in a later case in the same court, the true rule as to the power and duty of the jury in weighing evidence, is thus stated by Bigelow, C. J. " The jury are not obliged to receive evidence which is laid before them, passively, and follow it blindly, because it is not controlled or contradicted by counter-evidence. They are to examine it with care, subject it to the scrutiny of their judgment and experience, and act on

it only so far as it seems to them to be reasonable and true.'' *Bee Printing Co.* v. *Hichborn,* 4 Allen, 63.

In the charge of the court, the attention of the jury was particularly directed to the question of the existence of the alleged instructions, as the single important issue in the case. Upon this issue, the only evidence was that of the agent and his brother. The jury could not, through negligence or inadvertence, have omitted to consider this evidence, nor is there any reason to believe that they wilfully or wantonly disregarded it. That must be a strong case which will justify an interference by this court, with the exercise, by the jury, of their undoubted right of determining the credibility and weight of evidence. The testimony of the brothers Willius is by no means so clear or positive that the jury might not, in the exercise of a sound discretion, deem it insufficient to prove that the agent, in withholding the policy, acted under the alleged instructions of the company. The witnesses are not agreed, (either with themselves or with each other,) as to whether the instructions, under which it is claimed the agent acted, were printed, written or oral. The testimony of Ferdinand Willius is especially vague and uncertain, amounting to little more than a statement of his impressions and suppositions. Gustav is rather more positive that the instructions were in print. They agree that there were no special instructions for this case; that whatever instructions the agent acted under were general instructions. They do not profess to give the tenor of these instructions, but merely the substance. Gustav says they occupied half a page of a printed pamphlet; but his statement of their substance is given in one or two lines.

Aside from these objections to the weight of this testimony, it is highly probable that if such instructions as those in question were given at all, they would, from their importance, be assigned a prominent place in the general printed instructions to agents. Now this case had been tried once before, and the defendant was fully advised that its defence could be successfully maintained only by proof of these in-

structions. It was certainly within the power of the company to show, by plenary proof, whether general instructions of this kind were in fact given in print to its agents; and if such were the fact, it is difficult to believe that a copy of the pamphlet containing them could not have been readily procured, either at the home office at New York, or at some of the agencies of the company. The question is not before us whether, the instructions being in print, a copy of the same impression would not, as a duplicate original, be better evidence of their contents than the oral testimony of witnesses; but concerning ourselves merely with the credibility and weight of the evidence received, there can be no doubt that such a printed copy would be, if not technically better, certainly far more satisfactory evidence than the vague and uncertain impressions of witnesses, testifying to their recollection of the substance of documents they had not seen for many months, and which they do not appear to have ever carefully studied. The circumstance that this satisfactory evidence was not produced by the defendant, was one which the jury had a right to consider, in judging of the credibility and weight of the parol evidence offered in place of it; *Goodrich* v. *Weston,* 102 Mass. 362; and if they drew the very natural inference that printed instructions were withheld, because, if produced, they would not have sustained the defendant's case, and for this reason declined to give to the parol testimony even the weight to which they might otherwise have thought it entitled, it is not for the defendant to complain of a conclusion which, if erroneous, it might have prevented by the convincing proof that would have been afforded by the documentary evidence in its possession.

It is contended that the second policy should have been excluded, for want of proof of the signatures of the defendant's president and secretary thereto. But the answer, verified by the agent, F. Willius, denies the delivery only, and not the execution, of this policy; nor is there any denial by oath or affidavit of the execution or the signatures. Gen. Stat., ch. 73, § 82; Laws 1867, ch. 64. Moreover, the

policy was, in itself and on its face, competent evidence; 18 *Minn.* 448; and the general objection to its admission, as "incompetent and immaterial," was not sufficiently specific to apprise the court or the opposing counsel of the particular ground of objection now taken. *Sergeant* v. *Kellogg,* 5 Gilm. 273, 280; *Buntain* v. *Bailey,* 27 Ill. 409; *Rindskoff* v. *Malone,* 9 Iowa, 540; *Atkins* v. *Elwell,* 45 N. Y. 753.

The question put to the plaintiff on cross-examination, "Who attended to this business for you?" was properly excluded. It was not a proper cross-examination, for the witness had only testified to matters she had personally attended to; and it was, so far as we can see, wholly immaterial.

The answer of F. Schwendler to the fifth interrogatory was clearly inadmissible. It purports to be merely his conclusion from facts afterwards to be stated in his deposition.

His answer to the sixth interrogatory was properly excluded. It related in part to the contents of a letter which would itself have been better evidence. Moreover, all this part of the answer was immaterial, for the plaintiff's rights could not be affected by anything done by the company or its agent, after the tender was made.

In regard to the other objections taken to the exclusion of testimony, it is enough to say that in each case, the error, if any, was afterwards cured by the testimony of the same witness.

The objections to the first instruction given at the plaintiff's request, and to the refusal of the first, second, and sixth instructions asked by the defendant, were considered and disposed of on the former appeal. 18 Minn. 448.

The fourth, fifth, seventh and eighth instructions requested by defendant, severally assume the existence of the alleged instructions to Willius as a fact proved, and withdraw from the jury the question whether the evidence in the case is sufficient to support this conclusion.

The remainder of the numerous points made by the

defendant were considered and disposed of **on** the former appeal.

Order affirmed.