## ROGERS v. GREAT–WEST LIFE ASSUR. CO.
### No. 12594.

Circuit Court of Appeals, Eighth Circuit.

Oct. 26, 1943.

Robert Cowling, of Minneapolis, Minn. (Thompson, Hessian & Fletcher, of Minneapolis, Minn., on the brief), for appellant.

Charles F. Noonan, of Minneapolis, Minn. (Dorsey, Colman, Barker, Scott & Barber, of Minneapolis, Minn., on the brief), for appellee.

Before WOODROUGH, THOMAS, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The beneficiary in a life insurance policy has appealed from a summary judgment entered against her in a suit on the policy.

The company's motion for summary judgment was predicated upon the insured's agreement in the application that the policy should not take effect "until the same is delivered and the first premium thereon paid to the Company, no change having taken place in the insurability of my life subsequent to the completion of this application." For purposes of the motion, the parties had made a written stipulation of the facts as to the delivery of the policy and the payment of the premium, and the trial court held that this stipulation conclusively showed that the policy had never been delivered and the first premium paid, and that the policy accordingly had not become effective.[1]

The beneficiary contends here that the facts in the stipulation would have supported an inference that there had been an extension of credit on the first premium and a constructive delivery of the policy, and that the case therefore presented an issue of fact for jury determination and could not properly be disposed of on summary judgment.[2]

[1] The opinion of the trial judge is published in 48 F.Supp. 86.

[2] See Rule 56(c), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

█ The parties agree that the case is controlled by the law of Minnesota. Minnesota, like other states, holds that the existence of a life insurance contract may validly be conditioned upon actual delivery of the policy and payment of the first premium.[3] Where the insured has been given possession of the policy, the circumstances may in some situations be sufficient to imply and support an inference of credit extension for the premium.[4] If the application does not expressly require that the first premium be paid in cash and the insured is not otherwise charged with notice of any limitation upon the agent's authority in premium collection, the soliciting agent may be held to have apparent authority to accept a note or otherwise "give a short cred't for the first premium."[5] If the agent under his apparent authority has accepted a note or has agreed with the insured for some other credit extension, a constructive delivery of the policy may be held to exist from the time it is sent to the agent for delivery.[6] No question of constructive delivery is presented, however, if there are other binding conditions precedent to be performed by the insured or the agent in favor of the company, or, of course, if the minds of the parties have not fully met on the contract.[7]

█ The primary question here, therefore, is whether the facts set out in the stipulation could soundly have supported an inierence that there had been a binding extension of credit for payment of the first premium. If they could, a factual question was probably presented on which appellant was entitled to a jury trial, as she contends.[8] If they could not soundly support such a credit extension inference, then no question of constructive delivery could possibly be involved, and that question need not be given further consideration.

The salient facts of the stipulation on the question of credit extension follow.

The insured and Addy, a soliciting agent of the company, had conferred about increasing his life insurance program, and the insured decided to take out an additional policy for $5200. Addy was a close friend of the insured and had previously written other life insurance policies for him, and their relations were apparently much more personal than in the ordinary life insurance situation.

The insured duly took and passed the required medical examination, and the application was sent to the company's home office in Winnipeg, Canada. No arrangements were then made for payment of the first premium. The company executed a policy under date of March 16, 1942, and forwarded it to its branch office in Minneapolis, Minnesota, where it was turned over to Addy. Addy and the insured went over the policy together and discovered that it incorrectly stated the insured's age. The insured also decided that he wanted the regular premium payments on the policy to commence as of September 1, 1942, and requested that the policy simply provide for term insurance coverage to that date. The insured offered to make payment at

---

[3] Zemler v. New York Life Ins. Co., 177 Minn. 273, 225 N.W. 81; Kilborn v. Prudential Ins. Co., 99 Minn. 176, 108 N.W. 861; Heiman v. Phœnix Mut. Life Ins. Co., 17 Minn. 153, 17 Gil. 127, 10 Am. Rep. 154; Braman v. Mutual Life Ins. Co., 8 Cir., 73 F.2d 391.

[4] Reagan v. Philadelphia Life Ins. Co., 165 Minn. 186, 206 N.W. 162. But see also the discussion in Sawyer v. Mutual Life Ins. Co., 166 Minn. 207, 207 N.W. 307.

[5] Kilborn v. Prudential Ins. Co., 99 Minn. 176, 108 N.W. 861, 865. There are some expressions in some of the later Minnesota cases which seem to imply that the credit extension must itself give rise to a separate obligation which can be and is "taken in payment of the premium", or, in other words, is substituted for the obligation of the application. See Martin v. Business Men's Assur. Co., 188 Minn. 262, 246 N.W. 882, 884, and Sawyer v. Mutual Life Ins. Co., 166 Minn. 207, 207 N.W. 307, 308. It may be that, under these expressions, a general credit extension by the agent, which does not constitute an independent and complete payment agreement by the insured, capable of being legally substituted for the first-premium obligation in the application, but which merely waives and extends the time for performance of such obligation, is insufficient in Minnesota to afford the basis for any constructive delivery of the policy. That question, however, it is unnecessary for us to determine.

[6] Kilborn v. Prudential Ins. Co., supra. See also comment in footnote 5.

[7] Kilborn v. Prudential Ins. Co., supra, 108 N.W. at page 862; Bowen v. Prudential Ins. Co., 178 Mich. 63, 144 N.W. 543, 544, 545, 51 L.R.A.,N.S., 587; 29 Am.Jur., Insurance, § 152.

[8] See Ikenberry v. New York Life Ins. Co., 127 Minn. 215, 149 N.W. 292.

that time for the term insurance coverage, but Addy stated that he was not certain that his premium calculation of $43.74 would agree with the figures of the home office, and it was decided therefore to allow the matter to rest until the policy had been returned by the home office.

The company executed the corrected policy as of April 15, 1942, and it was received at the Minneapolis branch office on April 16, 1942, when it was again turned over to Addy. The stipulation recites that "there were no conditions or restrictions controlling Mr. Addy's right to deliver said policy to the insured", and that "nothing remained for the defendant company or Mr. Addy to do other than to turn the policy over to the insured *and to collect the first premium.*" (Emphasis added.)

The stipulation further recites: "That on the morning of said 16th day of April, 1942, Mr. Addy called the insured by phone and informed him that his policy had arrived and was in his hands. Mr. Addy was told by the insured that the insured would be engaged in a Board of Directors' meeting for the balance of that day and probably until after Mr. Addy's office hours, and that Mr. Addy should hold said policy for the insured and that the insured would come in the next day and pick it up. That nothing was said during said telephone conversation concerning the amount or payment of the first premium. On the evening of the same day, April 16th, the insured died suddenly of heart failure on the street in Minneapolis."

The stipulation also sets out a number of statements made by Addy to the beneficiary or to some of her representatives, subsequent to the insured's death. Thus, Addy stated that he did not accept the insured's proffered check for the term insurance coverage at the time the policy was returned to the company because "he had known the insured all his life and that the insured knew that he could pay for said policy later after they determined the exact amount of said term premium." He further stated "that if the insured had sent over for the policy, he would have delivered it to him without collecting any payment therefor; that he was not holding the policy for payment; that in fact, he had done business with Mr. Rogers (the insured) ever since their college days and that if he had any doubt about Mr. Rogers' willingness or ability to pay for the policy

he would have taken the check for $43.74 when it was offered to him the first time." On another occasion he declared "that the insured's credit was good with him and that he would have sent the policy to the insured by any method the insured had requested, but that instead the insured had requested that he hold the policy for him until the following day; * * * that, by reason of his long friendship with the insured, there had been no question of payment raised, and * * * that said policy was in his possession solely to suit the convenience of the insured." Again, on a later date, Addy declared "that he had retained possession of the insurance policy at the request of the insured and to suit the insured's convenience; that no mention of a premium was made in the telephone conversation between Mr. Addy and the insured on April 16th; that the insured had made no statement concerning the payment of premium in said telephone conversation; that the insured knew that he did not have to worry about the payment of a first premium and that he could have paid it at any time after that, and that, had it been necessary, Mr. Addy would have advanced the money to the company out of his own pocket as he had done on a few other occasions with people whose credit was good with him."

We agree with the trial court that these facts would not legally warrant or support an inference that there had been any mutual arrangement or agreement for credit between the agent and the insured. They show a willingness on the part of the agent to have extended credit and to have obligated himself personally to the company therefor, if necessary, but nothing more. They do not show that the insured, in the light of his situation on the morning of April 16, 1942, either desired or would have been willing to obligate himself to the company or to the agent for any credit extension.

The insured's offer to pay the premium on the term insurance coverage at the time the policy was returned to the home office is without legal significance, for the stipulation clearly shows that it was finally agreed that the payment should be allowed to wait until its amount had been correctly determined by the home office and the policy had been reissued and returned. There was nothing said to show that it was intended that credit should be extended as

of that time for such amount as the home office might compute the premium to be.

The stipulation shows no further conversation about the premium or arrangements for its payment, between the time the policy was sent back to the home office in March and its return on April 16, 1942, so that the critical transaction here is simply the telephone conversation between the agent and the insured on April 16, 1942. In that conversation, as we have indicated, no mention was made of how the premium was to be paid. The agent did not even inform the insured of what the amount of the home office's premium calculation was. The insured merely asked that the policy be held for him until he could pick it up the next day. The application did not obligate the insured to pay or arrange for payment of the premium until the policy was delivered to him, and there is nothing in the telephone conversation that indicates any intention to bind himself until he had seen or picked up the policy. The dealings between the agent and the insured had not been such that if, on April 17, 1942, the insured had undertaken to pick up the policy and it had then become apparent to the agent that some change had taken place in the insurability of his life, the agent would not have been legally justified in refusing to make delivery of the policy.

The subsequent statements of the agent—without attempting to pass upon their general competency—legally indicate nothing more than that he would have been willing to have extended credit to the insured on the basis of their personal friendship and past dealings, as we have already suggested, if the insured had desired it. In this connection, it is perhaps not without significance that the stipulation is shown by the briefs to have been prepared by appellant's counsel and so may reasonably be assumed to have stated the facts as strongly in appellant's favor as it was fairly possible to do so. The agent's statements do not show that he ever actually extended credit on behalf of the company, or credit personally by substituting himself as a debtor to the company in the insured's behalf. Legally, of course, he could do neither, except on the insured's request or with the insured's knowledge and consent.[9] In the present situation, as the trial judge significantly put it in his written opinion, "the inescapable fact is that no request for credit had been made."

The language used by the Minnesota court, in Zemler v. New York Life Ins. Co., 177 Minn. 273, 225 N.W. 81, 82, is appropriate here, that "there is nothing in the record which would justify an inference that [the insured] understood or had any reason to believe that the policy would go into effect until the actual payment of the premium."

No doubt the parties would have acted differently, if either of them had anticipated that the insured would die on the evening of April 16, 1942, but the unfortunateness of this unexpected event will not permit us to make an artificial interpretation of the facts, in order to bridge the defect in the parties' contractual status. We can only dispose of the legal situation as it was left by the actions of the parties.

Affirmed.

---

9 If, as referred to in footnote 5, supra, the Minnesota cases intend to go the length of holding that a credit extension, which will sufficiently furnish the foundation for a constructive delivery of the policy, can only be said to exist where a separate premium-payment obligation has been created and substituted for the premium-payment obligation of the application, so as to be equivalent technically to a satisfaction or discharge of the latter, appellant's contention here would have even less legal arguability.