Susan J. WANSHURA, Respondent,

v.

STATE FARM LIFE INSURANCE COMPANY et al., Appellants.

No. 48322.

Supreme Court of Minnesota.

Dec. 1, 1978.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan and J. Richard Bland, Minneapolis, for appellants.

Courey & Smith, Minneapolis, for respondent.

Heard before KELLY, TODD, and WAHL, JJ., and considered and decided by the court en banc.

TODD, Justice.

George R. Meissner, a State Farm Life Insurance Company agent, solicited a life insurance application from John Wanshura. Wanshura disclosed a prior history of cancer. State Farm conducted a medical examination of Wanshura which failed to discover a detectable renewed cancerous condition. State Farm mailed a policy to its agent for delivery to Wanshura. Meissner telephoned Wanshura's wife who agreed to an increased premium and delivery of the policy on the following day. During the telephone conversation, she disclosed that her husband was hospitalized. Thereafter, the agent refused to deliver the policy. The jury found constructive delivery, and the court ordered judgment against State Farm. We affirm.

The facts in this case are not in dispute. In July 1969, John Wanshura underwent surgery for a cancerous kidney condition. He made a good recovery and led a normal, active life. He attended college and participated in sports, including hockey and golf. In July 1973, he married Susan Wanshura. Susan contacted Meissner with whom she had previously done business regarding household and automobile insurance. Meissner met with Susan and John at their apartment on August 23, 1973. During the course of the meeting, Meissner raised the question of life insurance. John indicated he desired to be insured but disclosed his medical history, including the cancer operation, and the fact that he had been rejected for life insurance a year before. Meissner suggested that an application be submitted and he filled out a State Farm form which disclosed all pertinent facts regarding John's medical history. John signed the application for a $20,000 policy. Meissner indicated the standard premium would be about $20 per month.

The application was received by State Farm, which then arranged to have John

examined by its physician on September 24, 1973. The scope of the examination was determined by the initial underwriter and did not include blood tests. The directions to the physician did request that a urinalysis be forwarded with the medical report, which was done. The examination disclosed no adverse symptoms.

On October 17, 1973, State Farm's home office issued a life insurance policy in the amount of $20,000 on the life of John Wanshura. It forwarded the policy to its agent, Meissner, with instructions to personally deliver the policy to John and obtain John's written consent to both the increased premiums of $56.10 per month for a period of 6 years and the issuance of the policy without a waiver of premium disability clause. On October 22, 1973, Meissner received the insurance policy from the home office of State Farm with the instructions concerning delivery. The manual issued by State Farm to its agents also contained directions as to the delivery of the policy. However, none of this information was contained in the application signed by John, nor was it known to him or his wife. Meissner attempted to reach the Wanshuras by phone on several occasions but did not contact anyone until he spoke to Susan on the evening of November 14, 1973.

During the same time that State Farm was processing the application and issuing the policy, John Wanshura developed health problems. On October 2, 1973, John visited his family medical clinic complaining of headaches and a mild temperature. These symptoms were similar to those experienced by Susan earlier and apparently John believed he had been infected by the same virus. He was given antibiotics, but the symptoms persisted, so John again went to the clinic on October 18, 1973. At this time, he also complained of a tired, aching feeling and tingling in the extremities. A blood test was ordered, which disclosed abnormal protein. He was hospitalized on October 27 for more extensive tests. On October 31, a liver biopsy disclosed a malignant, inoperable cancer. Except for a brief 36-hour period, John remained hospitalized through November 14, 1973.

On the evening of November 14, 1973, Meissner telephoned Susan and stated that he would like to deliver the policy the following day at 4:30 p. m. He further advised Susan that the premium would be $56.10 instead of $20, and she said that was fine. No mention was made of the waiver of premium disability clause. Susan then specifically inquired about the effective date of the policy—whether it was the issuance date of October 17 or the delivery date. Meissner advised her it was the issuance date. Susan asked him if he was sure and Meissner said "Yes." Susan then stated that her reason for inquiring was that John just got out of the hospital and had developed problems. Meissner did not ask about John's health but merely stated that he was sorry. He further stated he would come out with the policy at 4:30 p. m. the next day. The next morning Meissner canceled the appointment and the policy was never delivered or the premium collected. John Wanshura died from cancer on May 1, 1974.

Dr. R. J. Rosenquist, a specialist in internal medicine, testified as an expert witness for plaintiff. He had examined John on October 18, 1973. He ordered the blood tests and performed the liver biopsy. He also testified that he had performed medical examinations for insurance companies. He testified that if he had been performing the insurance examination, he would have performed blood tests because of the history of cancer. He further testified that the cancerous condition he diagnosed in John on October 31, 1973, was in existence on September 24, 1973, the date of the insurance physical and that it could have been detected. This testimony is uncontroverted.

The trial court submitted to the jury only the question of whether there had been a constructive delivery of the policy. The jury answered in the affirmative. The court found that other conditions of the policy had been satisfied and ordered judgment for plaintiff.

The issues presented are:

1. Was there a delivery of the policy within the terms of the policy?

2. Was there payment of a premium?

3. Assuming affirmative answers to the first two issues, did these events occur during the "continued insurability" of John within the meaning of the policy?

1. State Farm contends that the application for insurance submitted by John requires that he remain continually insurable up to the time of the actual physical delivery of the policy and the payment of the premium. The applicable language of the application provides:

> " * * * [T]here shall be no liability until, during the lifetime and continued insurability of the Proposed Insured * * (1) a policy has been issued and delivered, and (2) all or a part of the initial premium has been paid, in which case such policy shall be deemed to have taken effect on the Policy Date thereof * *."

There is no dispute that the policy was issued by State Farm on October 17, 1973. The policy provided that payment of the initial monthly premium of $56.10 would provide coverage to November 16, 1973. It is further undisputed that State Farm's agent, Meissner, received the policy on October 22, 1973, for the purposes of delivery to the insured. Meissner was instructed in a letter accompanying the policy that he was not authorized to deliver the policy other than by manual delivery of the policy during the lifetime and the continued insurability of the proposed insured. However, these conditions were never communicated to John, nor are they part of the insurance contract.

The case was submitted to the jury for its answer to a single question: "Was there delivery of the insurance policy to John Wanshura in November of 1973?" The jury answered this question affirmatively. In submitting this question to the jury, the court instructed as follows:

> "Let me talk to you a moment about a few things about what the law is in this case. Now, whether or not John Wanshura continued to be insurable at the time of the November 14th, 1973 telephone conversation between George

Meissner and Susan Wanshura, should not be considered in arriving at your decision. Now, acceptance of an insurance contract can be either oral or written. It is a fact question and you must look into the circumstances, the relationship of the parties and what they intended to have done.

> "Delivery of a life insurance policy is necessary to effectuate the life insurance policy. However, actual delivery of the policy to the insured is not necessary for the contract to be effective. Delivery of the policy may be accomplished if the company relinquishes possession by mailing the policy to the agent and if nothing further remains to be done by the agent but the ministerial acts of delivering the policy to the insured. This is an act that involves no discretion.

> "So, you have to determine if that was what happened there."

The trial court determined as a matter of law that there had been a tender of the premium and that the issue of continued insurability was not a jury question.

■ In considering the issue of delivery, we note at the outset that the question asked the jury is technically inconsistent with the jury instruction. The jury instruction concerns delivery by mailing the policy to Meissner, which occurred in October 1973, whereas the question posed to the jury concerns delivery in November 1973. Thus, even if the jury found Meissner had only ministerial acts to perform when he received the policy from State Farm in October, the jury technically could not answer in the affirmative the question of whether delivery had been accomplished in November. However, we conclude that this technical inconsistency was harmless and did not affect the merits or substance of the question or instructions as a whole. We turn now to the merits of the delivery issue.

Cases in Minnesota as well as other jurisdictions uniformly hold that constructive delivery is sufficient to satisfy the "delivery" requirement and that actual delivery is not required. In general, the Minnesota cases have found constructive delivery

when the insurer manifested its assent to the consummation of the insurance contract. In several of these cases, the court required an element · of delivery even though the insurance policy did not expressly require delivery. In *Heiman v. Phoenix Mut. Life Ins. Co.*, 17 Minn. 153 (Gil. 127) (1871), the insurance agent went to the place of the applicant's business for the purpose of delivering the policy. The applicant was out of the state so the applicant's son gave the agent a note for the policy premium. However, the agent refused to deliver the policy to the son, preferring to wait until the applicant returned. The applicant died before returning and the beneficiary brought an action on the policy. This court held that the policy was not constructively delivered, stating (17 Gil. 132):

"* * * To show this [constructive delivery], plaintiff must prove that there was something said or done, or both, with the intent thereby to give effect to the policy."

In *Schwartz v. Germania Life Ins. Co.*, 18 Minn. 448 (Gil. 404) (1872), affirmed on second appeal, 21 Minn. 215 (1875), the insurance agent attempted to deliver a policy but the applicant refused delivery, requesting that the policy be changed from annual premiums to semiannual premiums. This second policy was issued and sent to the agent. In the meantime, the applicant had become ill, and therefore the agent refused delivery when the applicant's wife came to his office to inquire about the policy. The applicant died without the policy ever having been delivered. The policy did not require delivery, but this court considered constructive delivery an element of the completed contract. This court held the policy was not effective, stating (18 Gil. 409):

"* * * And if Willius [the agent] had no authority, discretion, or duty in the premises, save only to deliver the policy upon payment of the first premium, then we can see no good reason why the transmission of the policy to him might not well be regarded as a signifying by defendant of its acceptance of plaintiff's proposition; nor any good reason why payment or tender of the first premium to such agent (even if delivery of the policy was withheld) would not have been completely effectual to entitle the plaintiff to the full benefits of the policy to the same extent as if it had been manually and unconditionally delivered."

This court has also considered the element of delivery when it is expressly required by the insurance policy. In *Sawyer v. Mutual Life Ins. Co.*, 166 Minn. 207, 207 N.W. 307 (1926), the insurance agent met with the applicant to deliver the policy. The applicant did not take possession because of difficulty in financing the premiums. The applicant died shortly thereafter, and this court held for the insurer. On the issue of delivery, this court said (166 Minn. 209, 207 N.W. 308):

"* * * Delivery is significant, ordinarily but not always controlling, because it is the conventional method of expressing the final assent of the parties to become bound contractually.

"It is clear that defendant never assented, through its agent or otherwise, to the policy's going into effect as a contract. * * * Even though we allowed the argument for plaintiff, that transmission of the policy to the agent might have been equivalent to delivery to Mr. Sawyer [the applicant], we would still be confronted by the fact, inescapable on this record, that neither defendant nor its agent assented to the policy's going into effect."

Accord, *Zember v. New York Life Ins. Co.*, 177 Minn. 273, 225 N.W. 81 (1929).

In *Allen v. Metropolitan Life Ins. Co.*, 179 Minn. 545, 229 N.W. 879 (1930), the insurance agent had taken the policy to the applicant's home for delivery, but actual delivery was not made because the premium was not paid. Three days later the applicant died. This court held for the insurer. Although the policy required that the policy be issued and delivered as conditions precedent, this court said (179 Minn. 548, 229 N.W. 881):

"The controlling question is not whether the policy was delivered but whether defendant ever assented to its going into effect as a contract. Of that, delivery would have been but evidence—ordinarily, but not always, conclusive. The conclusive thing here is that neither by delivery of the policy nor otherwise did defendant assent to become bound as insurer."

The Federal courts, applying Minnesota law, also have construed the requirement of delivery. In *Rogers v. Great-West Life Assur. Co.*, 48 F.Supp. 86 (D.Minn.1942), the insurance agent had sought delivery, but Rogers, the applicant, refused because of an error in the designation of his age and the amount of the premium. Rogers tendered a check for the premium but the agent refused the check because of his inability to compute the new premium. The new policy was subsequently issued and sent to the agent. The agent informed Rogers that he had the policy and Rogers responded that he would pick the policy up the next day. That night Rogers died. The Minnesota Federal District Court held that the premium had not been paid and the policy had not been delivered. The court said (48 F.Supp. 87):

"* * * It seems clear, therefore, that there was no intention to deliver that contract until the next day when Rogers intended to call at the agent's office. There was no act before Rogers' death on the evening of April 16th which evinces any intent or purpose on the part of the defendant company to part with the control of the policy. A conditional delivery to the agent is not delivery to the applicant."

The Eighth Circuit affirmed the Rogers decision. 138 F.2d 474 (8 Cir. 1943). The main issue addressed by the court was whether the agent had made a binding extension of credit for the premium. The language of the court, however, is instructive on the requirement of delivery (138 F.2d 475):

"If the agent under his apparent authority has accepted a note or has agreed with the insured for some other credit extension, a constructive delivery of the policy may be held to exist from the time it is sent to the agent for delivery. No question of constructive delivery is presented, however, if there are other binding conditions precedent to be performed by the insured or the agent in favor of the company, or, of course, if the minds of the parties have not fully met on the contract."

These cases indicate that actual delivery has never been required and that constructive delivery is sufficient. In general, constructive delivery, by the insurer, exists when the insurance company has manifested its assent to be bound finally on the policy. One way in which this assent might be manifested is when the policy is unconditionally delivered to the agent for delivery to the applicant. The cases indicate that "unconditional" in this context refers to the absence of discretionary acts by the agent on behalf of the insurance company. This conclusion is supported by cases in other jurisdictions. Annotation, 19 A.L.R.3d 953; Annotation, 145 A.L.R. 1434; Annotation, 53 A.L.R. 492. This was the essence of the trial court's jury instructions. Therefore, the trial court did not err in its instructions to the jury.

It is argued by appellants that the delivery to agent Meissner was conditional, requiring further discretionary acts by Meissner. At the time the policy was delivered to Meissner, he had the responsibility of (1) collecting the premium, and (2) obtaining John Wanshura's consent to the amount of the additional premium and the waiver of premium disability clause. Meissner claimed he also had the responsibility of determining whether the applicant was still in good health. The jury could have decided that collecting the premium was a ministerial task. With regard to obtaining John's consent to the additional premium and waiver of premium disability clause, these facts go to the question of the insured's acceptance of delivery, not the question of the insurer's constructive delivery. Finally, the jury could have found that

Meissner had no discretion to determine John's good health. Even the insurance application stated that the soliciting agent had no authority to pass on insurability. Moreover, the effective date of the policy, set by the insurance company, was the date of issuance rather than the date of actual delivery or payment of premium. When the initial premium charged by the insurance company is for the period commencing from the date of issuance, rather than a later date, this is evidence that the insurer assents to be bound from the date of issuance and that any duties of the agent thereafter are ministerial rather than discretionary.

■ In conclusion, the trial court's instruction to the jury was not contrary to Minnesota law. It may have been preferable, however, had greater emphasis been given to the element of the insurer's final assent as creating constructive delivery. The trial court instructed the jury that constructive delivery occurs when the policy is sent to the agent and no discretion remains in the agent. This is too narrow. Constructive delivery occurs at that time or any time thereafter once the insurer or its agent has manifested its final assent to consummation of the contract. Still, there was no error in the instructions under the facts of this case.

2. The trial court found that the premium had been tendered. The evidence as to the phone conversation between Susan Wanshura and Meissner on November 14, 1973, supports this conclusion. Likewise, the nature of the relationship of the parties supports the finding that Susan was the authorized agent of her husband. She conducted all the insurance matters with Meissner, including the homeowner and automobile coverage which led to the solicitation of the life insurance application. Meissner's dealings were with Susan, not John.

The question of tender of insurance premiums as satisfaction of the requirement of payment of initial premium is a question of first impression with this court. Courts in other jurisdictions construing insurance clauses that require payment of the first premium have concluded that actual payment is not required and that tender of the premium is sufficient. See, e. g., *Travelers Ins. Co. v. Melman*, 147 Md. 459, 128 A. 125 (1925); *Spragg v. Prudential Ins. Co. of America*, 50 Ohio App. 451, 198 N.E. 585 (1935); *Going v. Mutual Ben. Life Ins. Co.*, 58 S.C. 201, 36 S.E. 556 (1900); *Davis v. Safe Ins. Co.*, 117 W.Va. 405, 185 S.E. 690 (1936), affirmed on second appeal on other grounds, 120 W.Va. 505, 199 S.E. 364 (1938).

■ We have indicated our approval of tender of payments in other contractual situations. See, *Pogreba v. O'Brien*, 223 Minn. 430, 27 N.W.2d 145 (1947). We now hold that under the facts of this case there was a sufficient tender of payment to satisfy the prerequisite of payment required under the contract between the parties.

3. Finally, State Farm contends that even if there was a delivery of the policy and payment or tender of premium as we have determined, there can be no valid contract of insurance because of the requirement of continued insurability. The application signed by John Wanshura conditioned contractual responsibility of the insurer upon delivery of the policy and payment of the premium during the continued insurability of the applicant. We have sustained the finding that these events occurred by November 14, 1973. The question then becomes whether John was still insurable on November 14, 1973.

The trial court and plaintiff rely heavily on the Nebraska case of *Ortega v. North American Co. for Life & Health Ins.*, 187 Neb. 569, 193 N.W.2d 254 (1971). In that case, the applicant, Ortega, underwent a medical examination by the insurer on August 30, 1968. While the application was being processed, Ortega experienced health problems and was treated by his physician. On October 29, 1968, he was warned of a possible malignancy on his lung. On November 6, 1968, the insurance policy was delivered to him without his disclosure of recent health problems. Later that month, Ortega died from cancer. The Nebraska Supreme Court held that the policy had

been delivered and the first premium had been paid "during the continued insurability" of Ortega. The court said (187 Neb. 573, 193 N.W.2d 256):

"* * * The function of the 'continued insurability' clause is to protect the defendant against sudden changes in health arising in the interval between a medical examination and the consummation of the policy. * * *

"* * * The nature, scope, and extent of the physical and medical examination were entirely within the power of the defendant. It had Ortega examined on August 30, 1968. The doctor did not see fit to take a chest X-ray of Ortega or otherwise explore and determine the condition of his lungs. The defendant's doctor approved Ortega as 'insurable.' It follows that by so doing it assumed the risk of any later detected health defects existing at that time. The defendant itself set up the conditions of reliance for the issuance of the policy. Ortega complied in every respect with the requirements and conditions that the defendant required. Under the facts in this case, it is clear that the defendant seeks to retroactively establish and take advantage of error in its own examination and processing procedures prior to the actual issuance of the policy and the receipt of the premium. The defendant has a legitimate interest to protect in the period of time between its medical examination and the final issuance of the policy. A sudden heart attack or a serious accident and other sudden health developments fall within the legitimate range and the protection of the continued insurability clause. On the other hand, literal enforcement of the condition is harsh because, by its terms, it is operative irrespective of fraud or misrepresentation or knowledge on the part of the insured. We hold, in the absence of fraud or misrepresentation, that a health defect existing but undetected on the date of the medical examination cannot later be advanced as a breach of a continued insurability clause. * * *

"A succinct statement of the rule and the reason therefor appears in *Prudential Ins. Co. of America v. Kudoba*, * * *. In that case the court made the following statements: 'If an examination is made and the company, either with knowledge of an illness of the applicant thereby disclosed or without discovery of a pathological condition which in fact existed, thereupon issues a policy, it should not be allowed to repudiate liability by reason of any defective status of the health of the insured at that time, * * *.'"

Thus, the Nebraska court considered whether the cancerous condition had arisen between the time of the insurance company's medical examination and the time of consummation of the contract. Having found the cancer existed at the time of the insurer's medical examination, it held the insurer could not rely on the "continued insurability" clause to deny liability.

The Nebraska court also addressed the issue of whether Ortega had a duty to disclose the health problems which occurred after the insurer's medical examinations. The court found that Ortega had not breached any duty to provide material information because neither Ortega nor his doctors were sure of the cancer until after the policy was delivered, and an applicant for life insurance has no duty to voluntarily inform the insurer of new information about his health which arises after a medical examination by the insurer. 187 Neb. 580, 193 N.W.2d 259. The court recognized, however, that an insured must answer inquiries initiated by the insurer.

Other cases in the United States generally are in accord with *Ortega*. See, generally, Annotation, 60 A.L.R.2d 1429. There are some courts, however, which differ in their interpretation of the type of change in health which will cause the applicant to be uninsurable, even though he has undergone a medical examination by the insurer. The *Ortega* decision indicates that the applicant remains insurable if the disease causing death existed at the time of the insurer's medical examination, even though it did not manifest itself at the time of the examina-

tion. On the other hand, the California court holds that mere existence of a health defect at the time of the medical examination is insufficient to establish continued insurability. The decision of *Metropolitan Life Ins. Co. v. Devore*, 66 Cal.2d 129, 56 Cal.Rptr. 881, 424 P.2d 321 (1967) (en banc), indicates that an applicant is not insurable unless (1) the disease causing death was present at the time of the insurer's medical examination, and (2) the disease was either manifested at that time, or, if manifested after the examination, the applicant still believed he was in good health on the date of delivery. Thus, manifestation of the health defect, rather than its mere existence, is a critical element under the California rule.

The authoritativeness of the *Metropolitan Life* decision has been diminished, however, by the fact that two of the three cases upon which the California court relied were from Pennsylvania, and they have been subsequently clarified by the Pennsylvania Supreme Court. The Pennsylvania rule now refutes the California court's conclusion. In *Sherman v. Security Mutual Life Ins. Co.*, 447 Pa. 442, 291 A.2d 304 (1972), the Pennsylvania Supreme Court reversed a lower court opinion which had relied on prior Pennsylvania cases, stating (447 Pa. 448, 291 A.2d 307):

> "In support of its opinion, the court en banc relied on the following passage from the opinion of the Superior Court in the case of *Germano v. Home Life Ins. Co.*, 135 Pa.Super. 208, 5 A.2d 449 (1939):
>
> "'If between the signing of the application and the delivery of the policy the applicant's condition of health suddenly changes, so that a disease that was dormant, quiescent and inactive becomes active, acute and dangerous to life, requiring a major abdominal operation * * it does not matter that such change results from the sudden growth and development of a disease which the insured had when he signed the application for insurance but of which he was unaware.'
>
> "This is not an accurate statement of the law in Pennsylvania, for there is no way such language can be reconciled with

our desire, as stated in *Prudential Ins. Co. of America v. Kudoba*, * * * to allow an applicant for insurance who has 'passed' a medical examination administered by a representative of the company, to 'rest confident in the belief that he has obtained a valid policy of insurance upon his life.'

> "To achieve such certainty, we will not permit a company to rely on a 'good health' clause to deny recovery unless it is established that the insured was aware that he had contracted a *new* disease or condition between the time of his examination and the delivery of the policy, and failed to disclose this change in his health prior to delivery." (Italics supplied.)

■ We have considered these cases and adopt as our rule the following: Under a "continued insurability" clause, an applicant remains insurable if (1) the disease or physical condition causing death existed at the time of the insurer's medical examination, and (2) this disease or condition was detectable, even if not manifested. He is not insurable, however, if (1) he has knowledge of a disease or adverse physical condition at or prior to the time the policy is delivered, and (2) either (a) the disease or condition occurred after the medical examination, or (b) the disease or condition existed at the time of the medical examination but it was not detectable at that time.

■ John Wanshura satisfied the test for continued insurability. His expert, Dr. R. J. Rosenquist, gave uncontroverted testimony that the cancerous condition existed at the time of State Farm's medical examination and that it was detectable at that time. Furthermore, State Farm was generally aware of John's cancerous history and it charged a higher premium than normal because of it. Thus, it would appear that State Farm received exactly what it bargained for; namely, a person who could pass the medical examination and would pay the premium. Having decided to issue the policy to John, it cannot later assert the continued insurability clause as a defense when its own medical examination could

have detected the renewed cancerous condition.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.