## CLARA K. AMES v. NEW YORK LIFE INSURANCE COMPANY.[1]

December 29, 1922.

No. 23,171.

**Jury to decide whether misrepresentations affected the hazard.**
1. Upon the state of facts set forth in the opinion and following earlier decisions of this court, it is *held* that whether the hazard assumed by the defendant life insurance company was materially affected by misrepresentations in the application was a question for the jury.

**Higher premiums paid by the insured than required of standard risk.**
2. There was sufficient proof that a policy in which a higher premium was charged than the insured would have had to pay, if he had been classed as a standard risk, was accepted by the agent of the insured when he received it from the insurer.

**Insured not bound to disclose serious illness before delivery of policy.**
3. After the application was accepted and the policy issued, but before it was delivered and before the first premium was paid, the insured became seriously ill. In ignorance of the fact, the policy was delivered and a check for the premium received. It is *held* that the policy could not be avoided on the ground that the insured, or his representative, was bound to disclose the change in his physical condition and wrongfully failed to disclose it.

Action in the district court for Winona county to recover $10,000 upon defendant's life insurance policy. The case was tried before Callaghan, J., who at the close of the testimony denied defendant's motion for a directed verdict, and a jury which returned a verdict for $9,386.90. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*Butler, Mitchell & Doherty,* for appellant.
*Lamberton, Lamberton & Murphy,* for respondent.

[1] Reported in 191 N. W. 274.

LEES, C.

Action by the beneficiary in a policy of life insurance to recover the amount of the policy. Appellant sought to defeat a recovery on three grounds: First, that there were false statements in the application; second, that no contract of insurance was consummated; and third, that a change in the physical condition of the applicant took place between the date of the application and the date of the delivery of the policy and that such change was concealed. At the close of the evidence there was a motion for a directed verdict. The court denied the motion and refused to submit the last defense to the jury. A verdict in plaintiff's favor was returned and defendant has appealed from a denial of its alternative motion for judgment or a new trial.

1. The death certificate gave as the cause of death acute gangrenous appendicitis, with diabetes melitis as a contributory cause. The application contained two questions, answered by the insured as follows:

"Q. Have you consulted a physician for any ailment or disease not included in your above answers?

A. No.

Q. What physician, or physicians, if any, not named above, have you consulted or been treated by within the last five years, and for what illness or ailment? (If none, so state.)

A. None."

Defendant called as witnesses Dr. Dempsey and Dr. Nauth. Dr. Dempsey testified that in the spring of 1919 he saw the applicant at his home on a farm near Weaver, Minnesota, found him suffering from indigestion, advised him to stay in bed and if he did not feel well the next day to send word, and heard nothing further from him.

Dr. Nauth testified that a year or more before the applicant died . he visited him at his home on the farm and treated him for influenza. On examining him, he discovered tenderness in the region of the appendix and informed him that he might have an affected appendix. The attack of influenza was not serious and the doctor did not make a second call. Later on, the applicant came to the doc-

tor's office in Winona and was examined again. His weight was more than normal, and sugar was found in his urine. He was informed that he had diabetes and advised to diet. A week later he came again. There was another examination of his urine, which then contained no sugar, and he was so informed. These are the facts upon which the first defense is based and they present the close question in the case.

The court read section 3300, G. S. 1913, to the jury and instructed them that the statement that the applicant had not consulted a physician was material, and, if they found that the risk of loss was increased by reason of the answers to the questions above quoted, defendant was entitled to a verdict; also that, if the ailments described by the doctors were slight or trivial, the applicant was not required to mention them. Whether a misrepresentation materially affected the hazard assumed by an insurance company is usually a question for the jury. Johnson v. National Life Ins. Co. 123 Minn. 453, 144 N. W. 218, Ann. Cas. 1915A, 458; Ivanesovich v. North American L. & C. Co. 145 Minn. 175, 176 N. W. 502.

In Gruber v. German R. C. Soc. 113 Minn. 340, 129 N. W. 581, the insured died from tuberculosis. He failed to disclose that he had been treated by his physicians for throat trouble. It was held that if the applicant consulted doctors, or was treated by them for temporary or trifling ailments from which serious consequences were not to be apprehended and from which he recovered, his failure to disclose such consultations or treatment would not avoid the contract. In the Ivanesovich case it was remarked that whether the existence of hernia materially affects the hazard is, under statutes similar to ours, a jury question. In Olsson v. Midland Ins. Co. 138 Minn. 424, 165 N. W. 474, notwithstanding the uncontradicted testimony of a physician that he had treated the insured 50 or 60 times within the year preceding the application, it was held that the circumstances were such that it should not be declared as a matter of law that the insured had in fact received the treatments to which the physician testified. Many cases from other jurisdictions are cited in the briefs. They cannot be reconciled, but the preponderance of judicial opinion supports the doctrine of the Gruber case.

See 6 Cooley, Briefs on Ins. § 2163, and notes to Beard v. Royal Neighbors, 17 Ann. Cas. 1203, and to Metropolitan Life Ins. Co. v. Brubaker, 18 L. R. A. (N. S.) 362.

Appellant contends that there can be but one answer to the question whether the hazard it assumed was materially affected by the failure to disclose the consultations with Dr. Nauth. The force of the contention is weakened by the doctor's testimony that there may be a transitory sugar in the urine; that on his second examination of the applicant he found no sugar; that its presence is not a certain indication of diabetes, and by proof that, after its examining physician had made his report, specimens of urine were called for by appellant and sent to its home office more than once before the application was accepted. Under all the circumstances, we are of the opinion that the question was one for the jury and that the evidence would justify a negative answer.

2. The application was for an endowment policy of $10,000, payable in 20 years. The applicant was 40 years of age. He agreed that, if the company was unwilling to issue a policy at the premium rate corresponding to his age, the application should be for a policy at a premium rate corresponding to the company's valuation of the risk. The premium was rated up to the sum charged for a similar policy where the insured was 49 years of age, an increase from $504.60 to $613.10. One Jennings, a life insurance solicitor, was the agent of the applicant to procure the insurance. The policy was mailed to Jennings from appellant's Minneapolis office on June 28, 1920. He testified that he received and accepted it for the applicant on June 29. On that day the applicant was too ill to be capable of transacting business. It is, therefore, contended that there was no contract of insurance because the application was for a policy which would cost $504.60 per annum, whereas the policy offered cost more and was not accepted by the applicant himself. We are of a contrary opinion. The applicant was a substandard risk. He knew that to get insurance he would probably have to pay a higher premium than that charged for a standard risk. He placed the matter in Jenning's hands. It was within the scope of Jennings' authority to accept the policy offered. He says he ac-

cepted it when he received it. If he did, there was a completed contract, subject only to the condition that the first premium should be paid in the lifetime of the applicant, and Jennings' acceptance obligated the applicant to pay it. A contract may be formed by accepting a paper containing terms. 13 C. J. p. 277.

3. On June 26, 1920, the applicant and his wife were at Baraboo, Wisconsin. He became ill in the evening and started for home on the following morning. He reached Winona on the twenty-seventh, and was then so ill that he was taken to a hospital that night and submitted to an operation for appendicitis. He died at 10 o'clock in the morning of June 30. The application was dated May 11, 1920. The policy was issued on June 7 and sent from the home office in New York to the branch office in Minneapolis. It was held there until June 28, when it was sent to Jennings as already stated. He received it at Waterville, Minnesota, on the morning of June 29. In the afternoon of that day he mailed it to the applicant at Weaver. On the twenty-eighth, the cashier at the Minneapolis office mailed a letter to the applicant informing him that the policy had been forwarded to Jennings for delivery upon payment of the premium, that the application had been approved June 7, and that the policy had just been released from the Minneapolis office. The letter came to Weaver on June 29, and on that day an agent of the applicant, having authority to issue checks, drew a check on the Weaver State Bank for the amount of the premium and mailed it to the Minneapolis office, where it was received either at 8 or 10 o'clock in the morning of June 30. When these events took place neither Jennings nor appellant had knowledge of the applicant's illness. Such knowledge came to them in the evening of June 30.

On August 27, after receiving proof of death, appellant notified respondent that it took the position that no contract of insurance had been consummated, but, if such were not the case, that it elected to rescind the contract because it had been obtained by misrepresentations and concealment. Appellant kept the check for the premium until September 4, when it was sent by messenger to respondent and left with her. She immediately took it to her attor-

neys, and on the same day they mailed it back to the Minneapolis office. By the terms of the application, the policy was not to take effect unless the first premium was paid and the policy delivered during the lifetime of the applicant. Upon this state of facts, appellant asserts that it was the duty of those representing the applicant to disclose his changed physical condition, and that the failure to make such disclosure before it released the policy was a fraud entitling it to a rescission. We have examined all the cases cited on this phase of the case and will refer briefly to those most directly in point.

In Equitable Life Assur. Soc. v. McElroy, 83 Fed. 631, 28 C. C. A. 365, there was an intentional concealment of the fact that the applicant had become dangerously ill and was obliged to undergo a surgical operation. Negotiations for the policy were pending and proposals and counterproposals had been made. Under these circumstances it was held that a duty rested upon the applicant to disclose the facts unless the contract had already been completed. In Piedmont Ins. Co. v. Ewing, 92 U. S. 377, 23 L. ed. 610, the applicant being in extremis, a friend paid the premium, but concealed the applicant's condition. In Cable v. U. S. Life Ins. Co. 111 Fed. 19, 49 C. C. A. 216, the facts were substantially the same and the application contained the so-called good health clause. The holding in both cases is in line with the McElroy case.

The doctrine approved in the Federal cases is followed in several of the state courts. Harris v. Security Mut. Life Ins. Co. 130 Tenn. 325, 170 S. W. 474, L. R. A. 1915C, 153, Ann. Cas. 1915B, 380; McKenzie v. N. W. Mut. Life Ins. Co. 26 Ga. App. 225, 105 S. E. 720; Thompson v. Travelers Ins. Co. 13 N. D. 444, 101 N. W. 900; Security Life Ins. Co. v. Booms, 31 Cal. App. 119, 159 Pac. 1000. Opposed are New York Life Ins. Co. v. Moats, 207 Fed. 481, 125 C. C. A. 143; Going v. Mutual Ben. Ins. Co. 58 S. C. 201, 36 S. E. 556, and Schwartz v. Germania Life Ins. Co. 18 Minn. 404 (448), 21 Id. 215.

It was held in the Schwartz case that, after the company accepted the application and sent the policy to its local agent for delivery to the applicant, it was the agent's duty to make delivery

upon tender of the premium unless the parties had agreed otherwise or the agent had been otherwise instructed by the company, although the agent knew the applicant was dangerously ill at that time. The court was of the opinion that, if the agent had no authority save only to deliver the policy on payment of the premium, the company's acceptance of the application was conditional upon such payment alone. In short, the acceptance of the application and the execution of the policy were held to conclude the contract, subject to the sole condition that the premium should be paid.

If the insurer is not justified in refusing to accept the premium and deliver the policy under such circumstances, how can it be said that, if the premium is paid and the policy delivered in the lifetime of the insured, the contract may nevertheless be rescinded for the failure to disclose the sickness of the insured? If the sickness is known to the insurer, he cannot withhold the policy if the Schwartz case is followed, and the material facts are the same as they were there. Surely the insurer is in no better position if the fact of sickness is not disclosed than he is if he has knowledge of it. But if we gave effect to the doctrine upon which appellant relies, would the conclusion follow that, under the circumstances in the present case, the applicant or some one in his behalf should have given immediate notice of his illness so that delivery of the policy might be delayed until the final outcome of his illness was known? Or was it the duty of the respondent to return the policy because her husband was on his death bed when it came into the hands of his agent? We think not. Unlike most of the cases in which the doctrine has been asserted, the negotiations between the parties were no longer pending and no deception was practiced to get possession of the policy. Appellant and its agents were the actors. Uninfluenced by anything said or done by the applicant or his agents, without inquiry, and of its own motion, it delivered the policy and called for and received the premium. It is difficult to spell out fraud from anything that was said or done, left unsaid or undone.

We reach the conclusion that, viewed from any standpoint, the evidence fails to show that the applicant, or anyone representing

him, was guilty of sharp practice of any kind, entitling appellant to avoid the contract.

Order affirmed.