Wargovich, Exr., *v.* Metropolitan Life Insurance Co., Appellant.

422

Argued April 14, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*D. C. Jennings,* for appellant.

*Armin H. Friedman,* with him *Joseph B. Feldman,* for appellee.

Opinion by Keller, P. J., July 13, 1939:

This case, in our opinion, comes within the principles laid down by the Supreme Court in *Prudential Ins. Co. v. Kudoba,* 323 Pa. 30, 186 A. 793, and *Evans v. Penn Mutual Life Ins. Co.,* 322 Pa. 547, 186 A. 133, and the judgment entered on the verdict of the jury must be affirmed.

The facts may be stated as follows: On or before March 20, 1927, John Babyak applied to the Metropolitan Life Insurance Company for two policies of life insurance, one for $232, to be issued without medical examination, premiums payable weekly, and one for $800, to be issued after a medical examination, premiums payable monthly. The medical examination was held by the company's physician on March 20, 1927 and he signed the following certificate [1]: "This is to certify that upon the date above written [March 20, 1927] I PERSONALLY examined at the address given in part A hereof the Life proposed for Insurance and saw made the signature at the end of Part C, and am of the opinion that said Life is in *good* health, and that said Life's constitution is *sound.* I find the pecuniary circumstances and hygienic surroundings satisfactory and habits temperate and the insurance applied for in good faith with the purpose of being continued. I therefore recommend that this application be *accepted.*

*S. G. McCune*

Physician's Signature."

Policy No. 94051566 for $232, dated March 21, 1927 and Policy No. 94066 M for $800, dated April 1, 1927, were issued and delivered *together,* on or about April 1, 1927. Both policies were made payable to the executor or administrator of the Insured, "unless payment be made under the provisions of the next succeeding paragraph", commonly known as the Facility of Payment clause. No copy of the application and medical examination was attached to either policy, so that the provisions of sec-

---

[1] The words italicized are in the handwriting of the physician.

tion 318 of the Insurance Company Law of 1921, P. L. 682, 40 PS sec. 341, which substantially re-enacted the Act of May 11, 1881, P. L. 20, applied, and prevented the company from offering the application in evidence or its being considered as part of the policy contract.

The insured died on October 17, 1927 and, the company having refused payment, this action was brought on January 21, 1929, and a statement was duly filed and served with the summons.

The defendant filed an affidavit of defense in which it denied that the policies were in force, for the reason that the said John Babyak (1) was not in sound health on the date of said policies, and (2) had within two years before the date thereof been attended by a physician for a serious disease and (3) before said date had had cancer.

The policies contained a clause providing: "If (1) the insured is not alive or is not in sound health on the date hereof; or if (2) ...... the insured has ...... within two years before the date hereof, been attended by a physician for any serious disease or complaint, or, before said date, has had any pulmonary disease or chronic bronchitis or cancer, or disease of the heart, liver or kidneys, unless such ...... medical attention or previous disease is specifically recited in the 'Space for Endorsements' on page four in a waiver signed by the Secretary or Assistant Secretary ...... then, in any such case, *the company may declare this policy void* and the liability of the company ...... shall be limited to the return of the premium paid on the policy, except in case of fraud, in which case all premiums will be forfeited to the company." (Italics supplied).

By reason whereof the company denied all liability under the policies except for $45.27 for return of premiums paid.

The case was at issue and was put on the trial list (No. 85) on February 25, 1929, but was not tried. It then lay dormant until November 24, 1936, when follow-

ing the decision of the Kudoba case (June 26, 1936), it was again placed on the trial list (No. 123). On April 24, 1937 defendant presented a petition and obtained a rule to show cause why judgment of non pros. should not be entered, because of plaintiff's delay in prosecuting the action, averring as reasons therefor:

"Seventh. One of the defendant's material witnesses [without naming him] cannot be located and it may be impossible to procure his presence at the trial as a witness.

"Eighth. By reason of the long lapse of time, now about ten (10) years, since the occurrence of the matters involved in this suit in April of 1929 and prior thereto, the recollections of the witnesses as to the incidents involved would be indistinct, unreliable and unsatisfactory."

The plaintiff filed an answer denying any injury to defendant by the delay, and after argument, the court, on October 25, 1937, dismissed the petition and rule, and the case came on for trial on February 7, 1938, was submitted to a jury and resulted in a verdict for the plaintiff, on which judgment was entered.

Defendant has appealed and assigns for error (1) the dismissal of its petition and motion for judgment of non pros., (2) the refusal of judgment non obstante veredicto for the defendant for all but $45.27, (3) the refusal of a new trial for errors in the charge of the court.

To avoid repetition in the opinion, we shall discuss them in slightly different order.

(1) As respects the conditions in the policies as to the insured's sound health on the date of the policy, the policy for $800, No. 94066 M, comes squarely within the ruling of the Supreme Court in *Prudential Ins. Co. v. Kudoba,* supra, that where the insurance company does not rely on the sound-health clause in the policy, but makes its own medical examination of the applicant and thereafter issues the policy, it will be presumed

that the medical examination was satisfactory to the company or the policy would not have issued, and that by making such examination the company waived all future contentions as to the health of the insured at or prior to that time; and that,—in the absence of any misrepresentations or fraudulent statements on the part of the Applicant—the sound-health clause is to be construed as safeguarding the company against only such impairment of the health of the insured as may have arisen in the interval between the time the medical examination was made and the time when the policy was issued; or as expressed later (p. 36) by Mr. Justice STERN, the opinion writer, "We conclude, therefore, that the sound-health clause has no application to such diseases as the insured may have had at the time of the medical examination, but that its legal scope must be restricted to mean only that the applicant did not contract any new disease impairing his health nor suffer any material change in his physical condition between the time of such examination and the date of the policy."

In view of the fact that the policy for $232, No. 94,051,566, was not issued until after the medical examination of the insured, and was delivered contemporaneously with the $800 policy, with respect to which the medical examination was held, we think the same presumption applies to it and that the policy contract for $232 was likewise issued in reliance upon the medical examination rather than the sound-health clause in the policy and that the legal scope of the latter must also be restricted in accordance with the opinion of Mr. Justice STERN.

The company's medical examiner not only certified that from the examination made by him he was of opinion that the applicant was in good health, and his constitution sound and that he, therefore, recommended that the application for insurance be accepted, but he confirmed this certificate by his testimony on the trial

that the insured seemed to be in sound health when examined by him, and that there was nothing in his appearance which would lead him to think otherwise. His testimony, in this respect, was contradictory of the testimony of Dr. Ungerman, called as a witness for the defendant, and discredited the latter's testimony, which as hereinafter pointed out, was based wholly on recollection and was in a number of respects inconsistent and self-contradictory.

The evidence did not warrant binding instructions for the defendant on this score.

(2) The alleged breach of the conditions[2] in the policy as respects the attendance of a physician upon the insured for any serious disease or complaint within two years prior to March 20, 1927, or his having had cancer before said date, rests wholly on the testimony of Dr. Ungerman. It was not disputed that the insured died of cancer of the upper lip on October 17, 1927, but it was strenuously disputed that he had this cancer or had consulted Dr. Ungerman with reference to it, prior to the issuance of these policies.

Dr. Ungerman testified wholly from recollection, after a reference to his ledger, which was not introduced into the record. His case records, which contained the details of his consultations with patients, diseases with which they were afflicted and his treatment, etc., had been destroyed, he said, because he did not keep them for longer than ten years—which period, it will be noted, expired *after* this case was put on trial list No. 123 (November 24, 1936). His testimony was unsatisfactory and in some respects inconsistent and contradictory. He said that John Babyak first consulted him on December 31, 1926 and that he treated him until October 16, 1927; that Babyak had called to see him

[2] They were not true conditions precedent, as in *Youngblood v. Prudential Ins. Co.*, 109 Pa. Superior Ct. 20, 165 A. 666. For breach of them the company was authorized to declare the policies void.

about *once a week,* and he had given him *fourteen* treatments in all, according to his ledger[3]; that the sore was on the inside of the upper lip and the growth was very rapid; that when he treated it it bled; "The lip was swollen around it and this ulcer started to get larger and larger and the lip swelled up more and more, then hemorrhage started; you didn't have to touch it or anything, and as I said before it didn't heal. It just kept on and on" (69a) ; that the sore was plainly visible on the outside of the lip in a month or two after the first visit—certainly in two months, that is, by March 1, 1927, which was nineteen days before the medical examination for defendant by Dr. McCune, who saw nothing wrong in his appearance—that after treating him about a month or two,—he could not tell the exact date, for the record had been destroyed,—he called in a McKeesport surgeon, Dr. Arthur,—who was not called as a witness to confirm his recollection. He testified that he had told Babyak that he had a cancer, but he did not say *when* he told him, or that it was before March 20, 1927—he was not certain himself that it was cancer until the sore did not heal by treatment. On the other hand, the plaintiff produced testimony that John Babyak showed no signs of a sore on the mouth and did not consult a physician about it until July, 1927. Dr. Ungerman admitted he had other patients named Babyak, besides the insured and his family.

Associated with this branch of the case is the evidence relating to the proofs of death. Here again the proofs were in some respects inconsistent and contradictory. Dr. Ungerman, as the attending physician signed *two* statements which differed in some material respects; one of them (dated November 11, 1927) was not sworn to, and the one which purported to be sworn to (dated October 22, 1927) was disavowed by the doc-

---

[3] From December 31, 1926 to October 16, 1927 would cover a period of forty-one weeks; while from July 1, 1927 to October 16, 1927 would be fifteen weeks.

tor, because his name was incorrectly spelled, which shed some light on the character of his testimony; and he said he did not personally appear before the notary. In that proof he said the deceased had been ill three days when he was called in to attend his last illness—while in the other, he said two weeks. Furthermore, his oral testimony affected the evidential value of his statements in the proofs.

The 'claimant's statement' signed by Helen Bozogan, daughter of the insured, set forth in answer to Question 6, that the deceased first consulted the physician for last illness on December 31, 1926; but in reply to question 9, "Was deceased cared for by the company's Nursing Service during last illness? If not, state reason," the answer was, *"No—short duration of ailment."*

It was testified by Helen Bozogan, and not denied, that all the proofs were blank when signed by her and given by her to M. A. Faix, the agent of the company, and the answers, except the Doctor's, are all in Faix's handwriting.

Furthermore they are contradicted by the oral testimony in the case as respects the commencement and duration of the insured's illness. See *Borgon v. John Hancock Mutual Life Ins. Co.,* 99 Pa. Superior Ct. 377, 382.

We are satisfied that the evidence on this branch of the case was for the jury, under the ruling in *Evans v. Penn Mutual Life Ins. Co.,* 322 Pa. 547, 555, 556, 186 A. 133.

(3) No error was committed by the court in charging the jury that the burden of proving that the insured had been attended by a physician for a serious disease within two years prior to the dates of the policies and had had cancer before those dates, was on the insurance company defendant. See *Borgon v. John Hancock Mut. L. I. Co.,* supra, 382; *Connell v. Metropolitan Life Ins. Co.,* 16 Pa. Superior Ct. 520, 529. The defense was an

affirmative one raised by the insurance company and the burden of proving it rested on the company.

Nor did the court err, in view of the uncontradicted documentary evidence as to the medical examination by the company's physician on March 20, 1927, in charging the jury that the burden was on the defendant insurance company to show that the answers made by insured to the company's physician on that date to the questions relating to his having been attended by a physician for a serious disease within two years and to his having had cancer were false and were known by him to be false—in other words were not made in good faith, but were fraudulent misrepresentations: *Prudential Ins. Co. v. Kudoba,* supra, pp. 35, 36; *Evans v. Penn Mutual Life Ins. Co.,* supra, p. 557.

The case of *Indovina v. Metropolitan Life Ins. Co.,* 334 Pa. 167, 5 A. 2d 556, cited by appellant, is easily distinguishable on its facts. In that case an application for insurance was signed, which was copied into and made a part of the policy, and there was uncontradicted documentary proof that material representations as to the insured's health, made at his direction by his agent, were false and were known by him to be false.

Appellant's counsel, both in his brief and his oral argument, laid stress on certain errors of law in the opinion of the court below refusing a new trial and judgment non obstante veredicto. There are errors in it, for example, in stating that "since the Kudoba case, it can no longer be urged, at least in this State, that the sound health clause and the similar clause of no medical attention within two years, operate as conditions precedent and that they must be applied, regardless of the good faith of the insured"; and that the Kudoba case, in effect, overruled our decision in *Youngblood v. Prudential Ins. Co.,* 108 Pa. Superior Ct. 20, 165 A. 666. The Kudoba decision applies only to cases where the insurance company's physician made a medi-

cal examination of the insured, as was done in this case. In the Youngblood case there was no medical examination and in such circumstances it still remains the law, except in so far as it may be affected by the Act of July 19, 1935, P. L. 1319, 40 PS sec. 511a, as respects cases where a medical examination has been waived, and the agent of the insurer, who recorded the answers of the applicant, declares or certifies that the applicant is a fit subject for insurance. See *Schware v. Home Life Ins. Co.*, 134 Pa. Superior Ct. 53, 3 A. 2d 949. There is no conflict between the Kudoba case and the Youngblood case when their respective facts are borne in mind.

But the errors in the *opinion* of the court below were not present in the *charge* of the court, and could have had no injurious effect on the *trial*.

The appellant is confined to errors on the *trial* of the case. Errors in the opinion discharging a rule for judgment non obstante veredicto or for a new trial, which were not committed on the trial, are not assignable for error. If the trial was free from reversible error, it is of no consequence to the appellant that, after the trial, errors may have been made in the opinion discussing the applicable rules of law.

(4) Whether or not judgment of non pros. should have been entered because of plaintiff's delay in prosecuting the action was a matter within the sound discretion of the court, which will not be reversed except for clear abuse: *Penna. R. Co. v. City of Pittsburgh*, 335 Pa. 449, 6 A. 2d 907. The petition of the defendant was most indefinite and set forth nothing more than that one of its witnesses—not naming him—could not be located and it might be impossible to procure his presence at the trial; and that the recollections of the witnesses would be indistinct, unreliable and unsatisfactory. It did turn out on the trial that the recollection of the defendant's witness, Dr. Ungerman, was indistinct, unreliable and unsatisfactory, but that was

432

largely due to his destruction of his records, done after the case was set down for trial (November 24, 1936) and after the defendant moved for the judgment of non pros. Had it acted with due diligence itself, the records would not have been destroyed,[4] though whether that would have helped defendant we are in some doubt, in view of the other inconsistencies in Dr. Ungerman's testimony.

The assignments of error are overruled and the judgment is affirmed.

---

[4] According to Dr. Ungerman's testimony the case record began on December 31, 1926 and was closed on October 17, 1927. Ten years would carry it to October 17, 1937, nearly a year after the case was put on the issue list for trial.