EVE B. ORTEGA, APPELLANT, v. NORTH AMERICAN COMPANY FOR LIFE AND HEALTH INSURANCE, A CORPORATION, APPELLEE.

193 N. W. 2d 254

Filed December 17, 1971. No. 37964.

Robert W. Green and Larry W. Myers, for appellant.

James W. Knowles and Edward A. Mullery, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

WHITE, C. J.

Plaintiff sues as a beneficiary of a $99,000 life insurance policy. The insured deceased Ortego died of lung cancer shortly after the issuance of the policy. The issues (which overlap) are: (1) Whether Ortega breached a condition precedent requiring continued insurability between the time of the application and the issuance and receipt of the policy; and (2) whether Ortega intentionally failed to disclose certain material facts concerning

the lung cancer arising between the medical examination and the issuance of the policy. The district court submitted these issues to the jury which found for the defendant insurance company. A motion for judgment notwithstanding the verdict was denied. Based on the undisputed facts, we reverse the judgment of the district court and remand the cause with directions to enter judgment for the plaintiff.

Issuance of the policy, payment of the premium, and delivery are admitted by the defendant. In August of 1968 Ortega was contacted by John Adair, an agent of the defendant, regarding the purchase of the life insurance policy from the defendant. After some preliminary discussion, Ortega signed an application for the policy on August 23, 1968, and delivered it, undated, to Adair. The application was forwarded by Adair, the agent of the defendant, to the home office on September 16, 1968, at which time he dated it. The signed application contained the following relevant clauses:

"C. The insurance policy hereby applied for shall not be considered in force until a policy shall have been issued by the Company * * * and said policy received and accepted by the Owner and the first premium paid thereon, *all during the continued insurability of the person to be insured;* * * *.

"D. The Company shall have sixty days from the date hereof within which to consider and act upon this application and if within such period a policy has not been received by the owner or notice of approval or rejection has not been given, then this application shall be deemed to have been declined by the Company." (Emphasis supplied.)

As mentioned, the application was signed and delivered to Adair on August 23, 1968. On August 30, 1968, Ortega was examined by Dr. Richard Barry, a doctor of the defendant's choice. The doctor approved him for insurance. No chest X-ray was taken. The application and the results of the examination were forwarded to

the home office of the defendant in Chicago. No contention is made that the statements or representations made by Ortega in the application were in any way false or constituted a misrepresentation that would void the policy. The defendant assembled all of the facts it deemed necessary for determining acceptance, finished the processing of the application in its own internal operating procedure, and approved Ortega's application on October 24, 1968. On October 31, 1968, Adair informed Ortega that the policy had been approved and that he should pay the premium. The following day Ortega met with Adair and paid the premium. On neither occasion, October 31st or November 1st, did Ortega mention any recent health developments or make any disclosure as to any change in his condition. The evidence is conflicting as to the date the policy was delivered, but the parties agree that it was not later than November 6, 1968.

On November 6, 1968, therefore, the policy had been approved by the defendant (October 24th), forwarded to Adair, the premium paid, and the policy delivered to Ortega.

The essential facts relied upon by the defendant are as follows: On October 26th and 27th, 2 or 3 days after the approval of the policy by the home office of the defendant in Chicago, Ortega, returning from a trip, experienced pain in his right shoulder and coughed up blood. These incidents led him to consult his personal doctor, Dr. Henry Lehnhoff, on October 29, 1968. For the first time, on October 29, 1968, X-rays were taken and analyzed by Ortega's own doctor, Dr. Lehnhoff, and they revealed a shadow on Ortega's right lung indicating a possible malignancy. No confirmed diagnosis was made at this time, only a communication to Ortega of a shadow on his lung and a possible malignancy. Dr. Lehnhoff referred Ortega to Dr. Delbert Neis, a specialist in thoracic surgery, for further examination and diagnosis. Dr. Neis, after examination, was very suspicious of lung cancer and recommended surgery. Although

Ortega's doctors were suspicious, the evidence conclusively shows no biopsy or confirmed diagnosis of lung cancer had been communicated to him as late as November 1st. On November 6th, Ortega entered the hospital and surgery was performed on November 8th. During the operation, the hospital pathologist confirmed the tentative diagnosis of lung cancer, and Dr. Neis removed Ortega's right lung. From complications resulting from this surgery Ortega died in the hospital on November 12, 1968. The defendant rejected the plaintiff widow's claim and offered to refund the premium.

We reach the issue of "continued insurability." The acuity and industry of counsel have produced for our consideration a veritable kaleidoscopic display of authorities and analyses covering every tangent and facet of the facts and the law. The function of the "continued insurability" clause is to protect the defendant against sudden changes in health arising in the interval between a medical examination and the consummation of the policy. The approval by the defendant on October 24, 1968, the subsequent delivery of the policy and the acceptance of the premium raise a presumption that all conditions precedent such as "continued insurability" have been met and this presumption is sufficient to sustain the plaintiff's burden of proof unless the defendant introduces evidence to rebut it. Gallentine v. World Ins. Co., 167 Neb. 429, 93 N. W. 2d 374.

There is no contention of fraud or misrepresentation in the application by Ortega. It was delivered to the agent of defendant on August 23, 1968. Independent of the application, the defendant itself set up the conditions and the requirements by which it would determine the insurability of Ortega. It required a medical examination. The nature, scope, and extent of the physical and medical examination were entirely within the power of the defendant. It had Ortega examined on August 30, 1968. The doctor did not see fit to take a chest X-ray of Ortega or otherwise explore and deter-

mine the condition of his lungs. The defendant's doctor approved Ortega as "insurable." It follows that by so doing it assumed the risk of any later detected health defects existing at that time. The defendant itself set up the conditions of reliance for the issuance of the policy. Ortega complied in every respect with the requirements and conditions that the defendant required. Under the facts in this case, it is clear that the defendant seeks to retroactively establish and take advantage of error in its own examination and processing procedures prior to the actual issuance of the policy and the receipt of the premium. The defendant has a legitimate interest to protect in the period of time between its medical examination and the final issuance of the policy. A sudden heart attack or a serious accident and other sudden health developments fall within the legitimate range and the protection of the continued insurability clause. On the other hand, literal enforcement of the condition is harsh because, by its terms, it is operative irrespective of fraud or misrepresentation or knowledge on the part of the insured. We hold, in the absence of fraud or misrepresentation, that a health defect existing but undetected on the date of the medical examination cannot later be advanced as a breach of a continued insurability clause. Mathews v. Metropolitan Life Ins. Co., 89 So. 2d 641 (Fla., 1956); cf. Schodts v. American Hospital & Life Ins. Co., 313 S. W. 2d 946 (Tex. Civ. App., 1958); Adams v. Lasalle Life Ins. Co., 99 S. W. 2d 386 (Tex. Civ. App., 1936); Brubaker v. Beneficial Standard Life Ins. Co., 130 Cal. App. 2d 340, 278 P. 2d 966; Wargovich v. Metropolitan Life Ins. Co., 136 Pa. Super. 421, 7 A. 2d 568; National Life & Accident Ins. Co. v. Green, 191 Miss. 581, 2 So. 2d 838; Prudential Ins. Co. of America v. Kudoba, 323 Pa. 30, 186 A. 793 (1936).

A succinct statement of the rule and the reason therefor appears in Prudential Ins. Co. of America v. Kudoba, *supra*. In that case the court made the following statements: "If an examination is made and the company,

either with knowledge of an illness of the applicant thereby disclosed or without discovery of a pathological condition which in fact existed, thereupon issues a policy, it should not be allowed to repudiate liability by reason of any defective status of the health of the insured at that time, * * * the sound-health clause has no application to such diseases as the insured may have had at the time of the medical examination." "While it is true that ordinarily a contract conditioned upon the existence of a certain fact is unenforceable if the condition is unfulfilled * * * this principle is not fairly applicable to life insurance policies, where regard must be had to the fundamental social and economic factors underlying the whole fabric of the business of life insurance as practically conducted. * * * For the company later to be allowed successfully to contend that the policy never became effective because the applicant breached the sound-health clause in that he suffered from disease or bodily impairment when the policy was delivered to him, in a case where the same condition existed when the company examined him, would be to give countenance to a practice that, while perhaps not fairly to be characterized as fraudulent, would be unreasonably destructive of the protection which life insurance is aimed to secure. It would result * * * that 'no one would ever know if he were insured or not, even though he has passed a medical examination and received a policy.' "

We turn now to the period of time between the medical examination by the defendant's doctor on August 30, 1968, until the time of the consummation of the policy. Was the continued insurability clause breached during this period of time? As we have mentioned the function of the clause is to protect the defendant against sudden changes in health arising in the interval between the medical examination and the consummation of the policy. From what we have said, and giving full scope to the proper interpretation of the continued insurability clause, it was breached, under the circumstances in this case

only if the tumor was not present on August 30 but developed in the interim before the policy was consummated. For the defendant to prevail, it must prove that Ortega's tumor was not present on August 30, the time of the medical examination approval, but that it developed subsequent to that date. There is no evidence in the record of any nature whatsoever to sustain this contention. Further, it would appear that the defendant not only did not but could not do this. It failed to have any chest X-rays taken on August 30, 1968. Both Dr. Lehnhoff and Dr. Neis testified that they could not determine with reasonable medical certainty when the tumor developed. The record reveals the defendant had ample opportunity to discover the nature and degree of progression of the malignancy. Neither by way of cross-examination nor direct medical testimony, did the defendant present any medical testimony as to the type of malignancy and whether such type of malignancy could have or must have developed in the critical period of time between August 30, 1968, and the date of the issuance and receipt of the policy. This failure, we feel, is significant. The only other evidence on this issue is the death certificate, when Dr. Neis originally estimated the onset of the tumor as sometime in August 1968. Since the medical examination by defendant's doctor took place on August 30, 1968, at the very end of the month, this would tend to affirmatively suggest that the tumor was present at the time of that examination. There is no evidence to sustain a finding that the onset of the tumor was subsequent to August 30, 1968. It was therefore error for the court to submit these matters to the jury under proper instructions, because there is no evidence in the record from which a jury could reasonably conclude that the tumor was not present on the date of the medical examination on August 30, 1968. These facts bear direct relation to the operative legal principles applicable to this case. If the tumor had been present on August 30, 1968, the defendant's doctor

on proper examination could have discovered it by the means of a chest X-ray. Not only did the defendant's doctor fail to take a chest X-ray, but the defendant's own procedure did not mandatorily require a chest X-ray examination and left this to the discretion of the examining doctor. The defendant itself established the procedures to protect itself. It was free to examine Ortega as exhaustively as it liked. Its very purpose was to check upon the representations of application and to discover as comprehensively and as thoroughly as it wished, latent disease and health conditions that were material to its final judgment in accepting the risk on October 24, 1968. Its hindsight discovery, subsequent to Ortega's death, shall not be ripened into a retroactive curing of its original error or failure to take the steps that its own procedure permitted or should have required.

The defendant contends that Ortega breached the duty to it to disclose material information about his health which he learned after the medical examination and before the consummation of the contract. After experiencing pain in his right shoulder and coughing up blood on October 26 and 27, 1968, Ortega consulted his personal doctor, Dr. Henry Lehnhoff, on October 29, 1968. X-rays revealed a shadow on Ortega's right lung. This information was disclosed to Ortega; he was referred on November 1, 1968, to Dr. Delbert Neis, a thoracic surgeon. Dr. Neis recommended surgery, which was performed on November 8, 1968, at which time, on biopsy, diagnosis of lung cancer was confirmed for the first time. Despite the fact that the home office had already approved the policy, and on October 31st the defendant had informed Ortega that the policy had been approved, and that Ortega paid the premium on November 1, 1968, the very day that he first consulted Dr. Neis, the thoracic surgeon, the defendant contends that Ortega had an affirmative duty to seek it out and to disclose this information.

We reject this contention. In the first place, we ob-

serve that neither Ortega nor his doctors, including the thoracic surgeon, had any confirmed information as to malignancy until November 8, 1968, at least 2 days after the delivery of the policy. It is true, of course, that Ortega was advised by his personal doctor that the situation revealed by the X-rays of his chest was suspicious. At that time the policy had already been approved by the home office of the defendant and one day before he consulted the thoracic surgeon on October 31, 1968, the defendant's agent had informed Ortega that the policy had been approved. No inquiry was made by Adair, the agent, nor was Ortega asked to make any disclosures concerning the condition of his health. It is clear to us that the contention of the defendant herein would require a layman, after information that his policy had been approved and while consulting his doctor, to form a medical judgment as to the nature and extent and seriousness of his complaints and symptoms and to affirmatively advise the insurance company of such suspicions, even in the absence of no inquiry, examination, or request by the insurer. We reject such a harsh and impractical rule. Injustice of such a rule is apparent under the circumstances in this case when we reflect that the defendant's position, in effect, is to require Ortega, a layman, even without any firm diagnosis by his own doctors, to disclose and inform the agent of the defendant concerning a condition which the defendant's own doctor failed to examine into and to determine at the time of the medical examination. In only one case has our court specifically passed upon the question involved here. We adhere to the rule announced in Merriman v. Grand Lodge Degree of Honor, 77 Neb. 544, 110 N. W. 302, which holds generally that an applicant for life insurance has no duty to voluntarily inform the insurer of new information about his health which arises after a medical examination by the insurer. In that case the trial court erroneously instructed the jury as follows concerning the duty to inform the insurer: "In con-

sidering the question whether any statement made by the deceased, Katherine Merriman, was true or false, you should consider it as of the time she signed the application, *up to and including the time when the contract between her and the defendant company was completed*, being the time of the final approval of the application by the company * * *. This is true, for the reason that *up to the time of the final approval of the application it would be her duty to correct any statement, contained in her application made by her, which she subsequently learned was false."* (Emphasis supplied.) Our court reversed on the basis that the above instruction was erroneous and for failure to grant the beneficiary's request for instruction confining the applicant's knowledge of her medical condition to the time the application was signed. The court in that case discussed the consideration underlying its announcement of the following rule: "Consequently when an application is made and approved, there is no duty on the holder of the certificate issued on such application to notify the company of any subsequently discovered evidence of pregnancy, nor would the fact, if subsequently discovered, prevent her from certifying that she was in sound bodily health, if such certificate is otherwise true. The only representation here is as to her apparent state of health, and all of the evidence in the record shows that at the time (the time of the filing of the application) she was, to all appearances, a robust and healthy woman."

In an almost identical case, Ames v. New York Life Ins. Co., 154 Minn. 111, 191 N. W. 274, the Minnesota court said as follows: "Unlike most of the cases in which the doctrine has been asserted, the negotiations between the parties were no longer pending and no deception was practiced to get possession of the policy. Appellant (the company) and its agent were the actors. Uninfluenced by anything said or done by the applicant or his agents, without inquiry, and of its own motion, it delivered the policy and called for and received the premium. It is

difficult to spell out fraud from anything that was said or done, or left unsaid or undone."

Corollary to the above holding, and pertinent to our determination here is the general principle announced by the cases that an applicant for insurance has no duty to inform an insurer of new information about his health where the insurer fails to inquire into the existence of any new information after the medical examination. Metropolitan Life Ins. Co. v. Devore, 66 Cal. 2d 129, 56 Cal. Rptr. 881, 424 P. 2d 321; Harte v. United Benefit Life Ins. Co., 66 Cal. 2d 148, 56 Cal. Rptr. 889, 424 P. 2d 329; Commonwealth Life Ins. Co. v. Rider, 153 Ky. 130, 154 S. W. 906; American Bankers Life Assurance Co. of Florida v. Toth, 165 So. 2d 804 (Fla. App., 1964). It is true that the insurer has a right to know about any intervening conditions material to the risk it assumes, between the time of the application, the medical examination, and the final issuance of the policy. It may during this period of time completely reject the application and policy for any reason; it may make any inquiry or investigation concerning the health of the insured that it sees fit to inquire into. No issue is presented in this case that concerns this area, for the simple reason that no inquiry of any nature whatsoever was made by Adair, the agent, or any agent of the defendant prior to the time of the issuance of the policy and the receipt of the premium. Faced with the force of the Merriman holding and the equities of the situation, the defendant in this case asks us to overrule the Merriman case and follow the law of other jurisdictions. We think, however, that the Merriman case is sound and that the increasingly available opportunities and capacity for an insurance company to protect itself in this area indicate that it should be followed. Strong considerations of public policy indicate that where an insured has restructured his estate and financial situation, relying upon the availability of life insurance, a rule should not be adopted which permits a retroactive examination by an

insurance company, after death of the insured, and void the policy, absent fraud or misrepresentation or a positive violation of the conditions of the insured's contract material to the risk thereto. For this court to hold for the defendant, "* * * would be to give countenance to a practice that, while perhaps not fairly to be characterized as fraudulent, would be unreasonably destructive of the protection which life insurance is aimed to secure. It would result * * * that 'no one would ever know if he were insured or not, even though he has passed a medical examination and received a policy.'" Prudential Ins. Co. of America v. Kudoba, 323 Pa. 30, 186 A. 793 (1936).

The home office approved the policy. Adair was the agent of the defendant, he knew Ortega, could make any inquiry or request any information of Ortega that he desired, saw fit not to, and delivered the policy and received the premium, all prior to the operation on Ortega and the first confirmed disclosure of an uninsurable condition of lung cancer. Ortega was a good enough risk for the defendant to accept after a medical examination of scope and extent of its own choosing, and was a good enough risk for the defendant to accept his premium payment without further inquiry as to the condition of his health after the medical examination. This being true, he was a good enough risk for the defendant to pay this insurance now that he is dead. See Independent Life Ins. Co. v. Rider, 150 Ky. 505, 150 S. W. 649 (1912).

Under the material undisputed facts in this case the plaintiff was entitled to judgment as a matter of law, and the submission of the issues of continued insurability and the duty to disclose was error.

The judgment of the district court is reversed and the cause remanded with directions to enter judgment for the plaintiff.

REVERSED AND REMANDED WITH DIRECTIONS.