749 N.W.2d 491 (2008)
16 Neb. App. 661
Terence KUEHL, Appellant,
v.
FIRST COLONY LIFE INSURANCE COMPANY, Appellee.
No. A-06-1170.
Court of Appeals of Nebraska.
May 13, 2008.
*493 Richard J. Rensch, of Raynor, Rensch & Pfeiffer, P.C., Omaha, for appellant.
Kyle Wallor and John M. Walker, of Lamson, Dugan & Murray, L.L.R, Omaha, for appellee.
SIEVERS, CARLSON, and MOORE, Judges.
MOORE, Judge.

INTRODUCTION
In this declaratory judgment action, Terence Kuehl sought to establish his entitlement to the proceeds of a life insurance policy issued by First Colony Life Insurance Company to Terence's deceased wife, Deborah Kuehl. The district court for Douglas County entered an order sustaining the company's motion for summary judgment and dismissing the action, finding that Deborah failed to satisfy a condition precedent required by the company and that the policy therefore never went into effect. We affirm the decision of the district court.

BACKGROUND
In November 2003, Deborah obtained a life insurance policy from the company. Deborah died on March 23, 2004. On April 12, Terence, as primary beneficiary under the policy, submitted a "Proof of *494 Loss" to the company. Following an investigation, the company denied the claim for death benefits. On July 30, Terence filed a petition for declaratory judgment, seeking a declaration that the company wrongfully denied Terence's claim for death benefits and that the company is obligated to pay the $600,000 death benefits together with costs pursuant to Neb. Rev.Stat. § 44-359 (Reissue 2004). In its answer, the company admitted that it issued a life insurance policy. Also in its answer, the company, after admitting and denying various allegations, affirmatively alleged that Deborah made material misrepresentations during the course of the application and delivery process which rendered the policy void ab initio and, further, that Deborah failed to meet all conditions precedent to the policy by failing to advise the company of the change in her health status.
On May 10, 2006, the company filed a motion for summary judgment, and a hearing was held on the motion on July 17. Various depositions, affidavits, and discovery responses were admitted in evidence, which we now summarize.
The facts of this case are largely undisputed. In August 2003, Steven Violett, an independent insurance agent who had obtained life insurance policies for the Kuehls in the past, suggested that Deborah could obtain a better rate if she purchased a $600,000 life insurance policy from the company as a substitute for two existing $300,000 policies issued by other companies. On September 5, Deborah completed an application to the company. In this application, Deborah checked the box which indicated that she currently uses tobacco or other nicotine products. At the bottom of the application form, immediately above Deborah's signature, is the following language:
I represent: (1) the statements and answers given in the application are true, complete, and correctly recorded to the best of my knowledge and belief. . . .
I agree that: (1) I will notify the Insurer if any statement or answer given in the application changes prior to policy delivery; and (2) except as provided in tie Temporary Insurance Application and Agreement, if any, insurance will not begin unless all persons proposed for insurance are living and insurable as set forth in the application at the time a policy is delivered to the Owner and the first modal premium is paid.
(Emphasis omitted.)
"Part I" of the application was completed by Deborah on September 5, 2003. "Part II" of the application, the "Medical History," was completed on September 12 in conjunction with the insurance medical examination conducted on that day by Jo Myers, a medical examiner retained by the company. Myers testified in her deposition that she completed the information on the medical history by recording the answers given to her by Deborah. In addition to completing the written medical history, Myers obtained Deborah's height, weight, blood pressure, and pulse, along with an EKG reading. The medical questions asked by Myers of Deborah were preceded with this language: "In the past 10 years, have you had, been treated for, or been medically advised to be treated for, any of the following?" Deborah answered "No" to the questions concerning bronchitis, cancer, coughing up blood, chronic lung disorder, and tumor, mass, or lump. In the "Details" section of the medical history, Myers recorded that Deborah was last seen 5 years ago for a sinus infection and put on an antibiotic and that she was seen by her gynecologist in January 2003 for a "Pap and a mammogram." Also noted in this section was that Deborah's *495 mother died of lung cancer at age 58 and that her father had alcoholism and died of pneumonia at age 62. Immediately above Deborah's signature on the medical history form is the identical language noted above from part I of the application.
Due to a problem with the EKG machine, Myers was required to obtain another EKG reading from Deborah, which she did at Deborah's home on October 8, 2003. Myers testified that Deborah did not advise her of any changes in her health since completing the medical history on September 12.
The company issued a life insurance policy on November 7, 2003, which was delivered to Deborah by Violett on November 14. The "Policy Delivery Acknowledgment" form was signed by Deborah on November 14, and it stated:
By signing below, I confirm that on the Date of this Acknowledgment: (1) the Policy identified by the number above was delivered to me; (2) the first modal premium for this Policy was paid; and (3) all persons proposed for insurance under this Policy were living and insurable as described in each part of the application for this Policy.
Coverage under this Policy will begin on the date this Acknowledgment is signed and given to a Company representative along with the first modal premium payment provided all persons proposed for insurance under this Policy are living and insurable as described in each part of the application for this Policy.
The first premium payment was made by Deborah. Violett indicated that Deborah did not advise him that she was spitting up blood, nor that she had a chronic lung disorder or lung cancer, between the time of the application and the delivery of the policy.
According to Terence, Deborah began having trouble with spitting up blood around the middle of October 2003. Dr. Martin Mancuso, who practices internal medicine, was Deborah's primary care physician since 1986. Mancuso testified that he treated Deborah several times for chronic bronchitis and other respiratory infections prior to 2003. On October 9, 2003, Deborah had an office visit with Mancuso in which she indicated that she had been coughing up blood for 2 to 3 weeks. An x ray performed on October 9 in Mancuso's office revealed a "suspicious" shadow or mass which Mancuso discussed with Deborah, at which time he "probably" said it could be cancer. Mancuso's impressions at the time of the October 9 visit included chronic lung disease. Following a CT scan on October 14, a positron emission tomography scan on October 16, and a biopsy on October 30, Deborah was diagnosed with "[m]etastatic non-small cell carcinoma." On November 3, Deborah had a consultation for potential treatment of the carcinoma of her lung. Deborah passed away on March 28, 2004, as a result of the lung cancer.
Terence testified that between September 5 and November 14, 2004, he did not discuss with Violett the change in Deborah's health. Violett came to the Kuehls' place of business on October 23 to pick up the premium check. Neither Terence or Deborah told Violett at that time about Deborah's spitting up blood or that x rays revealed a tumor in her lung. Nor did the Kuehls advise Violett of Deborah's medical condition at the time Violett delivered the policy on November 14. Terence admitted that as of November 14, both he and Deborah knew that she had been diagnosed with, and was actively treating for, lung cancer.
The vice president and chief underwriter for the company stated in his affidavit that *496 Deborah's failure to disclose coughing up blood and the diagnostic testing she underwent were material to the underwriting of the policy and that had the company been informed of these events, it would not have allowed the policy to be delivered and would have made no offer of insurance until the cause of the coughing up of blood was determined, the testing was completed, and a diagnosis was made. He stated that had the company been advised of the diagnosis of lung cancer, it would have declined any insurance coverage on Deborah's life. He further opined that Deborah was not insurable under the company on November 14, 2003, the date of policy delivery.
On October 10, 2006, the district court entered a detailed, eight-page order, granting the company's summary judgment motion and dismissing Terence's petition with prejudice. Terence timely appeals.

ASSIGNMENTS OF ERROR
Terence asserts, combined and restated, that the district court erred in finding that the insurance policy was plain and unambiguous and in granting the company's motion for summary judgment.

STANDARD OF REVIEW
[1] The interpretation of an insurance policy is a question of law, in connection with which an appellate court has an obligation to reach its own conclusions independently of the determination reached by the trial court. Jones v. Shelter Mut. Ins. Cos., 274 Neb. 186, 738 N.W.2d 840 (2007).
[2,3] Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. Peterson v. Ohio Casualty Group, 272 Neb. 700, 724 N.W.2d 765 (2006). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. Id.

ANALYSIS

Is Insurance Policy Plain and Unambiguous?
[4-7] Insurance contracts, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used. If the terms of the contract are clear and unambiguous, they are to be taken and understood in their plain, ordinary, and popular sense. Fokken v. Steichen, 274 Neb. 743, 744 N.W.2d 34 (2008). An ambiguity exists in an insurance contract only when the policy can be interpreted to have two or more reasonable meanings. Id. The language of an insurance policy should be read to avoid ambiguities, if possible, and the language should not be tortured to create them. Hillabrand v. American Fam. Mut. Ins. Co., 271 Neb. 585, 713 N.W.2d 494 (2006).
The district court in this case found that the condition precedent requiring the insurance applicant to "`notify the Insurer if any statement or answer given in the application changes prior to policy delivery'" is clear and unambiguous. The court stated that a literal and plain reading of the clause demonstrates that it required the insurance applicant to inform the company of any change in the statements made in the application, including whether the applicant had been treated for "coughing up of blood" or "cancer." The court found that there is no other meaning which can be given to these policy provisions and that *497 no ambiguity exists which requires construction.
[8] In his brief, Kuehl does not argue that the language regarding notification of changes to answers given in the application is ambiguous. Rather, he concentrates on the language regarding being "insurable" at the time the policy is delivered. However, the district court did not address this language in its decision. The focus of the district court was upon the contractual obligation of the applicant to "`notify the Insurer if any statement given in the application changes prior to policy delivery.'" We agree with the district court that this provision is clear and unambiguous and, as discussed below, is dispositive of the case. Therefore, we need not address the issue of whether the language regarding being "insurable" is ambiguous. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. Fokken v. Steichen, supra.

Did Deborah Fail to Meet Condition Precedent?
[9, 10] The district court found that it is undisputed that between the time Deborah signed the application indicating she had never coughed up blood or had cancer and the effective date of her policy, her answers to those questions changed. The court concluded that Deborah had an obligation to update the answers given in her application for those changes in health and that because she failed to meet that condition precedent, the insurance contract never became effective.
Nebraska case law has recognized in the insurance context that a condition precedent must be performed before the agreement becomes a binding contract, and a condition precedent must be fulfilled before a duty to perform the contract arises. See Coppi v. West Am. Ins. Co., 247 Neb. 1, 524 N.W.2d 804 (1994). This proposition was applied relative to a health insurance contract in Donaldson v. Farm Bureau Life Ins. Co., 232 Neb. 140, 440 N.W.2d 187 (1989). In that case, the Nebraska Supreme Court held that a condition precedent to the formation of the insurance contract was a requirement that the insured not have existing health coverage with another insurer and that the insured's failure to cancel other coverage precluded the formation of a new policy of insurance with the defendant. See, also, Adolf v. Union Nat. Life Ins. Co., 170 Neb. 38, 101 N.W.2d 504 (1960) (failure of applicant to meet condition to submit to a medical examination resulted in no contract of insurance).
Kuehl argues that the district court's decision is directly contrary to the holding of Ortega v. North American Co. for L. & H. Ins., 187 Neb. 569, 193 N.W.2d 254 (1971). The facts of Ortega are very similar to the case at hand, in that between the time of the application for life insurance and the receipt of the policy, the insured experienced an episode of coughing up blood, consulted with a doctor, and had x rays taken which showed a shadow on his lung, indicating a possible malignancy. He died from complications resulting from surgery for removal of his lung, which occurred shortly after delivery of the policy. The insurer rejected his widow's claim, and she brought a declaratory judgment action. The district court entered judgment for the insurer following a jury verdict. The Supreme Court reversed the judgment, finding that the insured did not breach any duty to disclose material information about his health which he learned after the application and medical examination by the insurer.
[11] The focus of the Supreme Court's decision in Ortega was on the following *498 policy language contained in the application:
"The insurance policy hereby applied for shall not be considered in force until a policy shall have been issued by the Company . . . and said policy received and accepted by the Owner and the first premium paid thereon, all during the continued insurability of the person to be insured . . ."
187 Neb. at 571, 193 N.W.2d at 255-56 (emphasis omitted). The Supreme Court analyzed the continued insurability clause, noting that its function is to protect the insurer against sudden changes in health arising in the interval between a medical examination and the consummation of the policy. The court found that the approval by the insurer of the application, the subsequent delivery of the policy, and the acceptance of the premium raised a presumption that all conditions precedent such as continued insurability had been met and that this presumption was sufficient to sustain the plaintiff's burden of proof unless the insurer introduced evidence to rebut it. The court noted that the insurer set up the conditions and requirements by which it would determine the insurability of the insured, namely a medical examination and the insurer's doctor's approval of the insured as insurable. The court found that the insured complied in every respect with the requirements and conditions that the insurer required. The court held that, in the absence of fraud or misrepresentation, a health defect existing but undetected on the date of the medical examination cannot later be advanced as a breach of a continued insurability clause.
[12] There are two distinctions between Ortega, supra, and the case at hand which render its holding inapplicable to this case: the first difference being a factual distinction and the second, more important, difference being the policy language. First, in Ortega, neither the insured nor his doctors, including the thoracic surgeon, had any confirmed information as to the status of the malignancy until the surgery which resulted in his death, which was at least 2 days after delivery of the policy. In the present case, Deborah had a confirmed diagnosis of lung cancer 2 weeks before delivery of the policy. More important, however, is the difference in the policy language. In Ortega v. North American Co. for L. & H. Ins., 187 Neb. at 571, 193 N.W.2d 254 (1971), the insurer's position that the insured breached a condition precedent to coverage related solely to the continued insurability language of the policy. In Ortega, there was no contractual obligation of the insured to notify the insurer of any change in health status before delivery of the policy. The court in Ortega referred to the general rule that an applicant for life insurance has no duty to voluntarily inform the insurer of new information about his health which arises after a medical examination by the insurer. See Merriman v. Grand Lodge Degree of Honor, 77 Neb. 544, 110 N.W. 302 (1906) (insured not required to inform insurer of evidence of pregnancy discovered subsequently to physical examination and application for life insurance).
The difference between this case and Ortega, supra, is that in this case the insured had a contractual duty to inform the insurer of new information concerning statements in the application prior to policy delivery. Nebraska case law has not addressed this specific language in the context of a life insurance contract. At least one other jurisdiction has addressed a policy provision very similar to the one at issue here in the context of conditions precedent to formation of the contract. The Sixth Circuit discussed the effect of *499 the following policy provision contained in an application for life insurance: "`I understand that if my health or any of my answers or statements change prior to delivery of the policy, I must so inform the [insurer] in writing.'" Abella v. Jackson National Life Ins. Co., No. 97-3498, 1998 WL 708706 at *1 (6th Cir. Oct. 1, 1998) (unpublished disposition listed in table of "Decisions Without Published Opinions" at 165 F.3d 26 (6th Cir.1998)). In the application, the insured stated that he had never had any indication of chest pain, discomfort, or palpitations, that he had not had an electrocardiogram or x ray, and that he had not been advised to have any such diagnostic tests. After completion of the application, but before delivery of the policy, the insured experienced chest pains for which he underwent testing. The insured did not inform the insurer of these changes prior to delivery of the policy. The Sixth Circuit held that the provision requiring the insured to inform the insurer of changes in his answers was a condition precedent to coverage and, accordingly, affirmed the district court's grant of summary judgment in favor of the insurer. See, also, Willard v. Valley Forge Life Ins. Co., 218 F.Supp.2d 1197, 1201 (C.D.Cal. 2002) (application provided insurance would "not take effect until the application is approved and accepted . . . and the policy is delivered while the health of each person proposed for insurance and other conditions remain as described in the application" (emphasis omitted)).
We find the rationale in Abella, supra, to be persuasive. We conclude that the requirement in the company's policy that the insured notify the insurer of any changes in statements given in the application for insurance prior to policy delivery was a condition precedent to the formation of the insurance contract. This notification requirement was a condition of the contract which Deborah acknowledged and signed, and which she failed to satisfy. Deborah's answers to several questions in the application changed between September 12, 2003, the date of the medical history and examination, and November 14, the date of the policy delivery. Specifically, the questions relating to having been treated for coughing up blood, cancer, chronic lung disorder, and tumor, mass, or lump required a change in answer from "No" to "Yes" during this time period. Deborah's failure to notify the company of the changes precluded the formation of the insurance contract.
We conclude that the district court did not err in finding that the life insurance policy never went into effect and in granting summary judgment in favor of the company.

CONCLUSION
Because a condition precedent to the formation of the contract of life insurance was not fulfilled, the life insurance policy never went into effect. We affirm the district court's grant of summary judgment in favor of the company.
AFFIRMED.